UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

LARRY ALLEN CLUCHEY,

                  Debtor.

Case No. 21-00524-jwb

Chapter 7

_____/

WORLD ENERGY INNOVATIONS,
LLC, f/d/b/a WORTHINGTON ENERGY
INNOVATIONS, LLC,

                  Plaintiff

      v.

LARRY ALLEN CLUCHEY,

SHERRY D. CLUCHEY,

                  Defendants.

Adversary Proceeding No. 21-80053

_____/

**DEFENDANT LARRY ALLEN CLUCHEY'S ANSWER TO AMENDED COMPLAINT
FOR MONEY JUDGMENT, TO AVOID AND RECOVER VOIDABLE
TRANSACTIONS AND DETERMINE JOINT DEBT, AND TO DETERMINE
DISCHARGEABILITY OF DEBT**

      NOW COMES Defendant Larry Allen Cluchey (hereinafter referred to as "Mr. Cluchey"),

by and through his attorneys, Wardrop & Wardrop, P.C., and in Answer to the Amended Complaint

for Money Judgment, to Avoid and Recover Voidable Transactions and Determine Joint Debt, and

to Determine Dischargeability of Debt, states as follows:

**I.**      **PARTIES**

      1.      Plaintiff, WEI is a limited liability company organized and existing under the laws

of the State of Ohio with its principal place of business located in Fremont, Sandusky County,

Ohio, which recently changed its name through amendment of its articles of organization. Plaintiff is an Ohio citizen because its owners are Ohio residents.

**ANSWER: The allegations contained in Paragraph 1 are neither admitted nor denied as Defendant is without knowledge or information sufficient to form a belief and Plaintiff is left to its proofs.**

2. Defendant, Mr. Cluchey is an individual who currently resides, according to the Voluntary Petition (Dkt. No. 1) (the "Voluntary Petition") that he filed in the above-captioned chapter 7 bankruptcy on March 2, 2021, at 7095 Mindew Drive SW, Byron Center, Michigan 49315 (Kent County).

**ANSWER: The allegations set forth in Paragraph 2 are admitted.**

3. Defendant, Mrs. Cluchey is the spouse of Mr. Cluchey, and she is also an individual who currently resides at 7095 Mindew Drive SW, Byron Center, Michigan 49315 (Kent County).

**ANSWER: The allegations contained in Paragraph 3 are admitted. However, in admitting the allegations, Mr. Cluchey does not consent in any way to the addition of Mrs. Cluchey as a proper party and, in fact, avers that she is not a proper party to this action.**

## II.    JURISDICTION AND VENUE

4. Mr. Cluchey is the Debtor in the above-captioned chapter 7 proceeding pending before this Court in the Grand Rapids Division, Case No. 21-00524-jwb.

**ANSWER: The allegations contained in Paragraph 4 are admitted.**

5. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the referral of cases under Title 11 to bankruptcy judges set forth in W.D. Mich. LGenR 3.1(a).

**ANSWER: Paragraph 5 sets forth a conclusion of law for which no Answer is required. It is admitted that this Court has jurisdiction over Counts VIII, IX and X of the Complaint,**

but Mr. Cluchey denies that the Court has jurisdiction over Counts I, II, III, IV, V, VI and VII of the Complaint.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**ANSWER:  It is admitted that venue is proper for Counts VIII, IX and X of the Complaint but it is denied that the venue is proper for Counts I, II, III, IV, V, VI and VII as the filing of Count I, Count II, Count III, Count IV, Count V, Count VI and Count VII are procedurally improper under Part VII of the Federal Rules of Bankruptcy Procedure.**

7.      This Complaint states claims that are adversary proceedings governed by Part VII of the Federal Rules of Bankruptcy Procedure under Rule 7001(1), (4), (6).

**ANSWER:  Paragraph 7 sets forth a conclusion of law for which no Answer is required.  To the extent allegations of fact are made, it is denied that Count I, Count II, Count III, Count VI, Count V, Count VI and Count VII are Adversary Proceedings governed by Part VII of the Federal Rules of Bankruptcy Procedure and thus are procedurally improper.**

8.      This adversary is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), (I) and (O), and this Court has constitutional authority to enter judgment; however, to the extent that it is determined that this Court cannot enter final orders of judgment consistent with Article III of the United States Constitution, absent consent of the parties, WEI consents to entry of final orders or judgment by this Court.

**ANSWER:  It is admitted that as to those Counts of the Complaint over which the Court has jurisdiction that the same constitute a core proceeding and Mr. Cluchey consents to this Court entering final orders or judgments only in those Counts where the Court has proper jurisdiction.**

4867-8751-1598.1

9.      The exercise of personal jurisdiction over the Defendants by this Court is consistent with the Constitution and laws of the United States.

**ANSWER:  Paragraph 9 sets forth a conclusion of law for which no Answer is required.  To the extent allegations of fact are made, the same are denied with respect to Counts I, II, III, IV, V, VI and VII and as to the inclusion of Mrs. Cluchey as a party to this Adversary Proceeding.**

### III.    INTRODUCTION

10.      Plaintiff, WEI's claims arise from a contract entered into with Mr. Cluchey's wholly owned alter ego business entity, American Research Products, Inc. ("ARP"), which is a corporation that was organized by Mr. Cluchey under the laws of the State of Michigan, and which had its places of business at 571 Gordon Industrial Court SW, Suite E, Byron Center, Michigan 49315 and at 7095 Mindew Drive SW, Byron Center, Michigan 49315 (Kent County) at the times relevant to the facts alleged in this Complaint.

**ANSWER:  In response to Paragraph 10 it is admitted that there existed a contract between Plaintiff and American Research Products, Inc. ("ARP"), but it is denied that ARP is the alter ego of Mr. Cluchey.  The remaining allegations of Paragraph 10 are admitted.**

11.      The contract that WEI entered into with ARP was for the design, manufacture, and engineering of high pressure adiabatic humidification systems.  WEI agreed to purchase, and ARP agreed to manufacture and deliver, a total of ten (10) adiabatic humidifier systems (the "Systems" and "Units") for installation and use at the Memorial Sloan Kettering Cancer Center ("Sloan-Kettering" and "MSKCC"[1]) in New York, New York.

**ANSWER:  The allegations contained in Paragraph 11 are admitted.**

---

[1]    Mr. Cluchey, within the books and records of ARP, has referred to the project to build the adiabatic humidifier systems for WEI as the MSKCC.

12.    This is an action, in part, to establish the personal liability of Mr. Cluchey to WEI for the judgment that has already been entered against ARP, in favor of WEI, and to enter a money judgment against him based upon the fraud he perpetrated upon WEI and because ARP's corporate veil should be pierced because it is Mr. Cluchey's alter ego, which he has used to defraud WEI.

**ANSWER:  Paragraph 12 fails to set forth any factual allegations against Mr. Cluchey and therefore no response appears appropriate.  To the extent allegations of fact against Mr. Cluchey are made, the same are denied for the reason they are untrue.**

13.    Mr. Cluchey, and therefore ARP, acted to obtain money from Plaintiff under false pretenses, through false representations, and by actual fraud to induce Plaintiff to enter into a written contract with ARP, notwithstanding Mr. Cluchey's misrepresentations of his capabilities to perform the contract, and to then induce Plaintiff to pay substantial sums of money to build the Systems, which Mr. Cluchey never actually built, and to buy parts to manufacture the Systems that Mr. Cluchey largely never purchased.  In other words, not only did Mr. Cluchey fail to perform the agreed-upon promises, but he went further and misrepresented his progress—both the purchase of parts and assembly of the Systems—to Plaintiff in order to convince Plaintiff to pay and advance substantial sums of money to ARP to which ARP was not entitled.

**ANSWER:  To the extent Paragraph 13 sets forth conclusions of law, no answers are given. To the extent allegations of fact are made, all allegations of fact made in Paragraph 13 are denied.**

14.    Mr. Cluchey, and therefore ARP, failed to deliver a single complete system to Plaintiff, despite previously representing that three of the Systems (3, 4, and 7) were "100% complete" and that ARP needed (and was entitled to) advances under the contract to purchase parts for subsequent Systems – parts he never purchased, despite continually telling WEI otherwise.

5

**ANSWER:  The allegations contained in Paragraph 14 are denied for the reason they are untrue.**

15.     Moreover, Mr. Cluchey misrepresented to WEI how ARP was spending the monies advance by WEI.  He used the money obtained from WEI to pay corporate debts unrelated to ARP's contract with and obligations to WEI, to pay his personal debts and expenses, and to write a check to pay off a personal home equity line of credit secured by a mortgage on his residential real property on May 15, 2020, a mere two days after he repudiated the very contract with WEI that he had failed to perform and a mere two and a half weeks after WEI made its last payment of $96,320.78 to ARP on April 28, 2020.

**ANSWER:  The allegations contained in Paragraph 15 are denied.  Mr. Cluchey did not use any of the money.  ARP used the money to pay its obligations.**

16.     As with other, prior payments by WEI to ARP, Mr. Cluchey fraudulently induced WEI to pay him the last two payments totaling $96,320.78 on April 28, 2021, under the pretense that he had fully completed one batch of Systems and was going to use the money to buy materials for the next batch.  Instead, he then used almost all of the $96,320.78 to pay off the only mortgage on his residence.

**ANSWER:  The allegations contained in Paragraph 16 are denied for the reason they are untrue.**

17.     Mr. Cluchey's misrepresentations to WEI began before the Contract (as defined below) was even signed – On December 6, 2018, Mr. Cluchey insisted that "we have equipment and material on order for the [S]ystems and need the money to cover our expenses;" in fact, Mr. Cluchey and ARP did not purchase *any* equipment or materials until *after* the Contract was signed in March 2019.

**ANSWER:  The allegations contained in Paragraph 17 are denied for the reason that they are untrue.**

18.     The misrepresentations by Mr. Cluchey continued throughout the business relationship with WEI, the purpose being to procure more and more money from WEI to fund Mr. Cluchey's personal expenses and ARP's expenses unrelated to the WEI project.  And the misrepresentations continued through ARP's cancellation of the Contract, under insistence that ARP had no money to continue the WEI project but, curiously, had more than $71,000.00 to pay Mr. Cluchey's personal residential mortgage *after* declaring ARP had no money.

**ANSWER:  The allegations contained in Paragraph 18 are denied for the reason they are untrue.**

19.     Significantly, these are not simply allegations.  Rather, these are undisputed facts, derived from Mr. Cluchey's under-oath deposition testimony in the District Court Action (as defined below) that resulted in a judgment against ARP totaling more than $1.9 million.

**ANSWER:  It is unclear in Paragraph 19 what facts are being alleged.  To the extent that Plaintiff is alleging that Mr. Cluchey made misrepresentations, the same are denied for the reason that they are untrue.**

20.     This is also an action, in part, to avoid and recover from Mr. Cluchey and Mrs. Cluchey, as joint debts, certain fraudulent, voidable, and preferential transfers of ARP's money, much of which had been paid by WEI to ARP for the performance of ARP's obligations to WEI— to build the Systems under the Contract.

**ANSWER:  Paragraph 20 merely sets forth what Plaintiff attempts to be doing and does not allege any facts.  To the extent allegations of fact are made against Mr. Cluchey, the same are denied for the reason that they are untrue.**

21.    This is also an action, in part, to determine that the debts and resultant money judgment owed by Mr. Cluchey to Plaintiff, WEI are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and/or (a)(6).

**ANSWER: Paragraph 21 again simply sets forth what Plaintiff is attempting to do in this Adversary Proceeding. To the extent allegations of fact are made against Mr. Cluchey, the same are denied for the reason they are untrue.**

22.    And this is also, in part, an action to determine that Mr. Cluchey is not entitled to a discharge of his debts under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") pursuant to 11 U.S.C. § 727(a)(4).

**ANSWER: Paragraph 22 again simply sets forth what Plaintiff is attempting to do in this Adversary Proceeding. To the extent allegations of fact are made against Mr. Cluchey, the same are denied for the reason they are untrue.**

## IV.    BACKGROUND AND FACTS

### A.    Overview

23.    Plaintiff, WEI is a technology firm and solutions provider that teams with customers to deliver long-term sustainable energy solutions. WEI's services include providing energy assessments, designing holistic energy systems for its customers, providing energy conservation project management services, overseeing installation and implementation of energy systems, and monitoring energy systems to ensure they are performing according to the design.

**ANSWER: Mr. Cluchey is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 23 and Plaintiff is left to its proofs.**

24.     WEI entered into an agreement with Sloan Kettering for the provision of energy solutions.  One component of WEI's energy solution for Sloan-Kettering was the provision of high pressure adiabatic humidification systems—the Systems—for air handlers.

**ANSWER:  The allegations contained in Paragraph 24 are admitted, upon information and belief.**

25.     As further alleged below, WEI eventually entered into contracts with ARP (a Sloan-Kettering preferred vendor), for the design and manufacture of these Systems.

**ANSWER:  The allegations contained in Paragraph 25 are admitted.**

### B.     American Research Products, Inc.

26.     Mr. Cluchey officially formed ARP, a Michigan for-profit corporation, when he signed the Articles of Incorporation for ARP on or about February 16, 2005.

**ANSWER:  The allegations contained in Paragraph 26 are admitted.**

27.     The Articles of Incorporation for ARP were filed with the Michigan Department of Consumer and Industry Services, Bureau of Commercial Services, Corporate Division on February 16, 2005 (ID Number: 42688D).

**ANSWER:  The allegations contained in Paragraph 27 are admitted.**

28.     The initial address of ARP's registered office, as well as the address of Mr. Cluchey's residence at that time[2], both as set forth in the Articles of Incorporation, was 4509 Penny Lane, S.W., Grandville, Michigan 49418.

**ANSWER:  The allegations contained in Paragraph 28 are admitted.**

---

[2]     A Warranty Deed by which the real property commonly known as 4509 Penny Lane, Grandville, Michigan 49418 was conveyed to Larry A. Cluchey and Sherry D. Cluchey on October 12, 2001, was recorded with the Kent County, Michigan Register of Deeds Office on October 30, 2001 at Liber 5676, Page 1020 (Document Number 200110300134340).

29.     On about March 17, 2005, Mr. Cluchey signed an Action by Incorporator—Written Consent in Lieu of Organization Meeting of Incorporation of American Research Products, Inc., in which Mr. Cluchey, as the sole incorporator of ARP, a Michigan corporation, consented to the selection of himself and Dale M. Rueckert as the directors of ARP.

**ANSWER:  The allegations contained in Paragraph 29 are admitted.**

30.     Mr. Cluchey and Dale M. Rueckert, each as a Director of ARP, signed the Bylaws of ARP (the "Bylaws") on or about March 17, 2005.  A copy of the Bylaws, as produced to WEI by ARP and Mr. Cluchey, is attached as Exhibit A.

**ANSWER:  The allegations contained in Paragraph 30 are admitted.**

31.     Also on or about March 17, 2005, Messrs. Cluchey and Rueckert signed a Written Consent in Lieu of First Meeting of the Board of Directors of American Research Products, Inc. (the "Written Consent in Lieu of First Meeting") in which, among other things, Mr. Cluchey was elected to serve in the offices of President and Secretary, Mr. Rueckert was elected to serve in the offices of Vice President and Treasurer, and Messrs. Cluchey and Rueckert were each authorized to purchase 2000 common shares of ARP for $2,000.00.

**ANSWER:  The allegations contained in Paragraph 31 are admitted.**

32.     On about March 17, 2005, Mr. Cluchey signed an Action by Incorporator—Written Consent in Lieu of Organization Meeting of Incorporation of American Research Products, Inc., in which Mr. Cluchey, as the sole incorporator of ARP, a Michigan corporation, consented to the selection of himself and Dale M. Rueckert as the directors of ARP.

**ANSWER:   The allegations contained in Paragraph 32 are admitted.  Paragraph 32 is identical to Paragraph 29 above.**

10

33.     Also on or about March 17, 2005, each of Messrs. Cluchey and Rueckert entered into and executed a Stock Subscription, by which each of them agreed to pay ARP $2,000.00 in exchange for 2,000 common shares of ARP.

**ANSWER:  The allegations contained in Paragraph 33 are admitted.**

34.     Mr. Cluchey, as President of ARP, signed both Stock Subscriptions to accept the same on behalf of ARP, and the only two certificates of shares of the capital stock of ARP, each dated as of March 15, 2005 and signed by Mr. Cluchey as the Secretary and President of ARP, were issued to Larry Cluchey (Certificate No. 1) and to Dale M. Rueckert (Certificate No. 2), each for two thousand (2,000) shares.

**ANSWER:  The allegations contained in Paragraph 34 are admitted.**

35.     As Mr. Cluchey has previously testified in a deposition held on December 7, 2020 and continued on December 29, 2020 in the action filed against ARP and Mr. Cluchey in the United States District Court for the Northern District of Ohio, Case No. 3:20-cv-01454 on July 1, 2020, prior to this chapter 7 bankruptcy, and/or during the Section 341 meeting of creditors held on March 31, 2021:

      a.     Subsequent to the above-referenced initial incorporation paperwork, the Bylaws, written consents in lieu of meetings, and issuance of common shares, no further minutes or actions in writing were prepared or taken.

      b.     Subsequent to the initial purchase of 2,000 common shares of ARP, by each of Messrs. Cluchey and Rueckert, no further shares were purchased by either of them (or anyone else) or issued by ARP.

      c.     Subsequent to their purchases of 2,000 common shares of ARP, neither Mr. Cluchey nor Mr. Rueckert invested any additional capital in ARP; rather,

any money advanced by either of them to support the business of ARP was characterized as a "loan" that was not memorialized in any form and is evidenced only in bank account records showing transfers of money to ARP and, periodically, paid to Mr. Cluchey and Mr. Rueckert.

d.    After filing the incorporation papers for ARP, neither Mr. Cluchey or anyone else, did much, if anything, to keep corporate minutes or records of ARP's actions; it was something that Mr. Cluchey was aware of, but he just never did.  Indeed, Mr. Cluchey testified that he was not "spending any amount of time worrying about the little requirements of a corporation."

e.    Mr. Rueckert lives and works in Wisconsin and ARP does not have an office in Wisconsin.

f.    Although Mr. Cluchey and Dale Rueckert were technically co-directors, officers and shareholders of ARP, Mr. Cluchey has consistently stated that Mr. Rueckert played a very limited role with respect to ARP, acting only as a sales representative for ARP in Wisconsin on occasion, and taking no role in the day-to-day management or operation of ARP, which was solely controlled, overseen and conducted by Mr. Cluchey in Michigan.

g.    Despite the fact that ARP's Articles of Incorporation listed him and Mr. Rueckert as the co-Directors, Mr. Cluchey "can't agree" that he and Mr. Rueckert in fact were directors of the company from the beginning.

h.    ARP has had several different business addresses, but Mr. Cluchey has often used his home (residential) address for ARP.

12

     i.      When he used the word "we" in talking about ARP at the Section 341 meeting of creditors, he acknowledged that he was using the royal "we" because ARP is just him, nobody else.

     j.      Mr. Cluchey (not Mr. Rueckert) had check-writing authority for ARP.

     k.      Mr. Cluchey personally made the decision to avoid paying WEI in the instant matter, because he was personally upset that WEI filed the District Court Action.

     l.      Mr. Cluchey allowed ARP to miss out on corporate opportunities that, instead, he and Mr. Rueckert permitted Mr. Rueckert's own sales representative company to realize.

**ANSWER:  In response to a multitude of allegations made in Paragraph 35, with Paragraph 35 clearly violating the provisions of Bankruptcy Rule 7008, Mr. Cluchey would respond as follows:**

     **a.**      **The allegations contained in Paragraph a are admitted.**

     **b.**      **The allegations contained in Paragraph b are admitted.**

     **c.**      **The allegations contained in Paragraph c are denied for the reason they are untrue.**

     **d.**      **The allegations contained in Paragraph d are admitted.**

     **e.**      **The allegations contained in Paragraph e are admitted.**

     **f.**      **The allegations contained in Paragraph f are admitted.**

     **g.**      **The response given by Mr. Cluchey in the deposition was as set forth in Paragraph g.**

     **h.**      **The allegations contained in Paragraph h are admitted.**

4867-8751-1598.1

i.      **The allegations contained in Paragraph i are admitted.**

j.      **The allegations contained in Paragraph j are admitted.**

k.      **Mr. Cluchey does not remember saying the words set forth in Paragraph k, and therefore the allegations set forth in this subparagraph are neither admitted nor denied.**

l.      **The allegations contained in Paragraph l are denied for the reason they are untrue.**

36.     Since it was incorporated by Mr. Cluchey in 2005, Mr. Cluchey has signed, as President of ARP, all of the annual reports for ARP, all of which identify him as the registered agent for ARP, and many of which list his personal residence as the registered agent address.

**ANSWER:  The allegations contained in Paragraph 36 are admitted.**

37.     ARP has not filed bankruptcy and, as of the date of filing this Complaint, ARP remains a Michigan corporation that has not be dissolved.

**ANSWER:  The allegations contained in Paragraph 37 are admitted.**

38.     In his Voluntary Petition, Schedules and accompanying Statement of Financial Affairs, Mr. Cluchey represented under penalty of perjury that he owns 50% of ARP, which is inactive, ceased operations in 2020, and has no remaining assets (*see* Schedule A/B, Item 19; SOFA, Item 27); that WEI has a contingent, unliquidated and disputed claim against him in the amount of $1,695,723.94 for debt incurred in 2018-2020 based upon purchase orders for design / manufacture of "high pressure adiabatic humidification systems," for which WEI had sued ARP and Mr. Cluchey in Case No. 3:20-cv-01454 in the United States District Court for the Northern District of Ohio (*see* Schedule E/F, Item 4.9); and that the current address for ARP is his residence at 7095 Mindew Drive SW, Byron Center, Michigan 49315 (*see* Schedule H, Item 3.1).

**ANSWER:  In response to Paragraph 38, the Plaintiff believes that the Voluntary Petition, Schedules and accompanying Statement of Financial Affairs were accurate when they were filed with the Court.**

39.     ARP opened a checking account with Lake Michigan Credit Union ("LMCU") (Account No. xxxxxx5188) (the "LMCU Checking Account") on or about November 15, 2018, and later transitioned to using it as ARP's primary bank account in or about April 2019.  As of April 17, 2019, ARP's checking account with Comerica Bank had a zero balance, Mr. Cluchey having closed out the account.

**ANSWER:  The allegations contained in Paragraph 39 are admitted.**

40.     As later discovered through the examination of ARP's bank account statements and tax returns, ARP was never adequately capitalized and during the period of time in which it was obligated to perform its contract with WEI, the overwhelming majority of ARP's revenue was from the funds paid and advanced by WEI to ARP under the contract, and, to a much lesser extent, amounts that Mr. Cluchey drew on his Second HELOC and deposited into ARP's LMCU Checking Account.

**ANSWER:  Paragraph 40 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue, except that it is admitted that the contract with Plaintiff did represent a majority of ARP's revenue after the contract was signed.**

41.     According to ARP's LMCU Checking Account statements and its QuickBooks records, Mr. Cluchey appears to have taken draws on the Second HELOC (as defined below), which were then deposited into the LMCU Checking Account, as follows:

| Comerica Bank (2nd HELOC) Check No. | Transaction Date | Amount Transferred to LMCU |
|---|---|---|
| | | |
| 1156 | 8/20/2019 | $20,000.00 |
| | | |
| 201 | 8/28/2019 | $20,000.00 |
| | | |
| 202 | 9/10/2019 | $5,000.00 |
| | | |
| 204 | 10/1/2019 | $5,000.00 |
| | | |
| | | $50,000.00 |

**ANSWER:  In response to Paragraph 41 it is admitted that Mr. Cluchey borrowed money, using Mr. and Mrs. Cluchey's own personal residence as collateral to deposit into the corporate checking account and then subsequently the loan was repaid to him.  All transactions were properly accounted for in ARP's general account.**

42.    Other draws taken from the Second HELOC were not deposited into the ARP accounts.

**ANSWER:  The allegations contained in Paragraph 42 are admitted.**

43.    Prior to WEI's last payment to ARP of the total amount of $96,320.78 on or about April 28, 2020, ARP had $33,815.66 in its LMCU Checking Account.

**ANSWER:  The allegations contained in Paragraph 43 are admitted, upon information and belief.**

44.    As of April 28, 2020, following receipt of the last WEI Payment, ARP had $130,136.44 in its LMCU Checking Account.

**ANSWER:  The allegations contained in Paragraph 44 are admitted, upon information and belief.**

4867-8751-1598.1

45.     Following Mr. Cluchey's payment of $71,807.67 from ARP's LMCU Checking Account to Comerica Bank on May 15, 2020, as further discussed in Section IV.D. below, ARP had a remaining balance of $44,206.23 in its LMCU Checking Account and substantially no funds in any other accounts.

**ANSWER:  The allegations contained in Paragraph 45 are admitted, upon information and belief.**

46.     Moreover, subsequent to May 18, 2020, when the payment to Comerica Bank cleared ARP's LMCU Checking Account, ARP continued to use the WEI money to pay a variety expenses that, upon information and belief, included Mr. Cluchey's personal expenses and other ARP expenses unrelated to WEI.  For example, Cluchey used WEI's money to pay almost entirely ARP's AmEx debts, despite the fact that only some fraction of those expenses related to the WEI project.  And in June 2020, Mr. Cluchey also allowed ARP to continue making the monthly loan payments on the vehicle he used as his personal vehicle, a Honda Ridgeline (as defined below), along with all maintenance, fuel, and related costs.  On August 17, 2020, Mr. Cluchey caused ARP to pay co-owner Rueckert nearly $7,000.00 in commission on a project for which ARP should have been permitted to realize the commission itself.  And in July 2020, Mr. Cluchey caused ARP to pay $6,000.00 to a supplier relative to a non-WEI project.

**ANSWER:  The allegations contained in Paragraph 46 are denied with respect to the payment of personal expenses.  It is admitted that payments were made on the lease of the vehicle by ARP from Mr. Cluchey and that ARP paid the commission.**

C.     <u>Business Dealings with Worthington Energy Innovations, LLC</u>

47.     Russ Kiser, the General Manager for Plaintiff, WEI, personally met with ARP's principal owner, Mr. Cluchey to interview him for the project—a contract for ARP to build and

17

sell to WEI high pressure adiabatic humidification systems (the "Project"), which WEI in turn would sell to Sloan-Kettering.

**ANSWER:  In response to Paragraph 47, Mr. Cluchey avers that most of his interactions were with Ed Kiser.  Mr. Cluchey admits that Russ Kiser may have been at one or more meetings or been on one or more calls.**

48.    As set forth in the Declaration of Russ Kiser, which is attached as Exhibit B and is incorporated by reference herein, "Cluchey and ARP held themselves out to [WEI] as experts in the field of adiabatic humidification systems.  Based on their professed qualifications, and a positive recommendation from [Sloan-Kettering], WEI decided to hire ARP for the Project.  *See* Decl. of Russ Kiser at 1, ¶ 4, Exhibit B.

**ANSWER:  To the extent allegations of fact are made in Paragraph 48, the same are denied for the reason they are untrue.**

49.    In early July 2018, WEI communicated to Mr. Cluchey that they planned to use ARP for the Sloan-Kettering project, but they needed ARP's support to complete the design of the Systems.

**ANSWER:  The allegations contained in Paragraph 49 are admitted.**

50.    In response, Mr. Cluchey advised that "[w]e require a purchase order before we can start work, with our standard terms and conditions, as follows:

> Standard Terms:  50% down on release of purchase order, 40% on Shipment of each system, balance on completion of start-up and customer training.  We would expect the 50% down payment within the next two weeks so we can continue to support the engineering effort.

> Our pricing includes shipping and engineering and customer support, with a 2-year warranty on all components furnished by ARP, and generous time period for customer training.

*See* Email sent: Saturday, July 7, 2018 10:57 AM, Subject: RE: MSK Pricing and response to questionnaire. [External], attached as Exhibit C (emphasis added) and which is incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 50 are admitted.**

51.     On or about August 26, 2018, after a number of communications, Mr. Cluchey sent a written proposal to WEI (dated August 27, 2018) for the MSKCC Project with a description and proposed cost for each of the ten (10) high pressure adiabatic humidification systems, as listed in a table, the total costs being $1,192,093.00 (the "ARP Proposal").  A copy of the ARP Proposal is attached as Exhibit D and is incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 51 are admitted.**

52.     As set forth in the ARP Proposal prepared by Mr. Cluchey, "[t]he cost of each system, [sic] includes shipping to the job site and start-up services by ARP."  ARP Proposal at 4, Exhibit D.

**ANSWER:  The allegations contained in Paragraph 52 are admitted.**

53.     Also as set forth in the ARP Proposal prepared by Mr. Cluchey, "[o]ur terms are 50% Down on Order of each System, 45% on Delivery of each System, and Balance on completion of Start-Up and Owner Training of each system."  ARP Proposal at 4, Exhibit D.

**ANSWER:  The allegations contained in Paragraph 53 are admitted.**

54.     After further communications and a meeting between WEI and Mr. Cluchey, during which terms of payment and a draw schedule were discussed, it was determined that an engineering fee would be invoiced and paid separate from the amounts for the Systems.

**ANSWER:  The allegations contained in Paragraph 54 are admitted in general terms.  In further response, ARP asked for an up-front engineering fee to support the design efforts.**

**The fee was deducted from the cost of each system in proportion to the cost of each system. In other words, ARP paid for the engineering rather than Plaintiff with the advance from the base contract.**

55.     On or about September 17, 2018, Mr. Cluchey sent a written proposal to WEI for engineering support for the Worthington Project Team (the "Engineering Proposal"), which included but was not limited to "[c]omplete design of each high pressure adiabatic system" and "[d]ocument each system and provide CAD drawings or files as requested from engineering staff[.]"  The fee quoted for the services to be performed under the Engineering Proposal was $25,000.  A copy of the Engineering Proposal is attached as Exhibit E and is incorporated by reference herein.

**ANSWER:  In response to Paragraph 55 it is admitted that the proposal was sent on September 17, 2018.**

56.     As a result of WEI and ARP's initial negotiations, and the written proposal made by Mr. Cluchey dated September 17, 2018, WEI issued a Purchase Order No. 18126-FOG-091818 (the "Engineering Purchase Order") on September 18, 2018 for engineering support and services related to the design and manufacture of the Systems for the amount of $25,000.  A copy of this Engineering Purchase Order, along with the email by which it was sent to Mr. Cluchey on September 18, 2018, is attached as Exhibit F and is incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 56 are admitted.**

57.     Pursuant to the Engineering Purchase Order, in exchange for payment of $25,000.00 by WEI, ARP would (a) complete design of each System, (b) document each System and provide CAD drawings or files as required, (c) guide project members as required, (d) assist

in development of project schedules and costs, and (e) provide information and materials requested by the project team.  The Systems were to be incorporated into the Sloan-Kettering project.

**ANSWER:  The allegations contained in Paragraph 57 are admitted.**

58.    On or about September 19, 2018, Mr. Cluchey sent Invoice No. 4157 to WEI, in the amount of $25,000.00 for "Project Engineering Support per Proposal Letter Dated 9.17.18 by Larry Cluchey" (the "Engineering Invoice").  A copy of the Engineering Invoice, along with the email by which it was sent to WEI, is attached as Exhibit G and is incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 58 are admitted with the exception that the invoice was sent by ARP, not Mr. Cluchey.**

59.    WEI paid ARP $25,000 for the engineering services for the Sloan-Kettering project, via check no. 6136, which was deposited into ARP's bank account with Comerica Bank on or about October 12, 2018.

**ANSWER:  The allegations contained in Paragraph 59 are admitted.**

60.    At the time that WEI paid ARP the first payment of $25,000 for the engineering services, ARP had a mere $573.33 in its checking account with Comerica Bank, which at that time was ARP's principal bank account.

**ANSWER:  The allegations contained in Paragraph 60 are admitted, upon information and belief.**

61.    Important to the impact that ARP's fraud and failure to perform its contract have had on WEI and the damages it has suffered, Mr. Cluchey's design for the Systems is unique to ARP.  By virtue of proceeding with another vendor to build the Systems after Mr. Cluchey repudiated the contact, WEI learned that Mr. Cluchey's designs were not transferable to the other vendor, such that new engineering designs had to be prepared with concomitant cost and expense.

The resulting scope of work necessarily expanded (both internally at WEI and with vendors/contractors/suppliers) from what WEI contracted with ARP and Mr. Cluchey to provide in order to put WEI in the same position it expected to be before Mr. Cluchey repudiated the contract.  WEI not only spent substantial engineering/designing/coordinating resources, but also had to identify a new vendor to re-engineer the design because ARP's design was unusable by other vendors.  The new design then needed to be recirculated to contractors for re-scoping and re-budgeting.  Finally, WEI had to find an alternative solution to build ARP's skids for the Systems on-site since that was part of ARP's scope of work but largely was not performed.

**ANSWER:  Substantially all of the allegations contained in Paragraph 61 are admitted except to the allegation of fraud, which are denied because they are untrue.  ARP's inability to perform the contract caused some of the damages that Plaintiff suffered.**

62.     Following payment of the Engineering Invoice for engineering services, in order to perform under its agreement with Sloan-Kettering, WEI contracted with ARP for the manufacture of the Systems, which were to be used for air handlers designated by WEI in furtherance of WEI's agreement with Sloan-Kettering.

**ANSWER:  The allegations contained in Paragraph 62 are neither admitted nor denied for the reason that Mr. Cluchey does not have independent knowledge of Plaintiff's agreement with Sloan-Kettering.**

63.     On or about February 1, 2019, WEI sent ARP a Purchase Order #18126-013052-020119 (the "Contract") for ARP to build and deliver the Systems for each of the air handlers designated by WEI.  The terms of the Contract were accepted by the parties on or about February 11, 2019, as partly evidenced by the initials thereon.  The total purchase price set by the Contract for all of the Systems was $1,043,695.00.  A true and accurate copy of the Contract, along with

the email by which it was sent to Mr. Cluchey, is attached as Exhibit H and is incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 63 are admitted.**

64.     Notably, ARP's address listed on the Contract is Mr. Cluchey's residence.

**ANSWER:   In response to Paragraph 64 it is admitted that ARP used Mr. Cluchey's residence address as the registered address for the corporation, as it always has.**

65.     The Contract expressly incorporated Terms and Conditions: "Upon acceptance of this PO, this Document with Terms & Conditions of WEI supersede all others."  *See* Contract at Page 3 of 3, Exhibit H.  Among other things, the Terms and Conditions of the Contract specify:

a) "Time and quantities are of the essence under this Purchase Order.  Seller [ARP] agrees to 100% on-time delivery of the quantities and at the times specified by Purchaser [WEI], as set forth in this Purchase Order and related Contract documents, unless otherwise negotiated and agreed in writing by the parties.  Failure to meet agreed delivery time and quantities shall be considered a material breach of this Purchase Order and Seller shall pay to Purchaser any damages or expenses imposed upon or incurred by Purchaser as a result of such breach."  (Contract—P.O. Terms and Conditions, ¶ 3(b));

b) ARP "will pay whatever additional costs, expenses, consequential losses or damages Purchaser sustains due to Seller's untimely delivery or delivery of improper quantities."  (*Id.* ¶ 4(a));

c) ARP "will pay all costs, including reasonable attorney's fees, incurred by Purchaser in enforcing the terms of the Contract."  (*Id.* ¶ 7);

d) WEI may terminate the Contract for cause if ARP repudiates the Contract or fails to perform the Contract. (*Id.* ¶ 10);

e) the Contract is governed by New York law. (*Id.* ¶ 28).

**ANSWER:  In Answer to Paragraph 65, the Contract speaks for itself.**

66. ARP insisted on an aggressive payment schedule to perform the Contract, to which Plaintiff agreed, as slightly modified: (a) 50% of the total purchase price for each System due when construction of the System began; (b) 40% due when the System was received by Sloan-Kettering; (c) 10% due after the System started up, was commissioned, and Sloan-Kettering staff was trained on its operation.

**ANSWER:  The allegations contained in Paragraph 66 that ARP insisted on an aggressive payment schedule are denied.  The remaining allegations are admitted.**

67. The Systems were to be built in stages (also referred to later herein as "Batches"). The first stage was ARP's manufacturing of Systems 3, 4, and 7, for a total price of $344,417.47.

**ANSWER:  The allegations contained in Paragraph 67 are admitted.**

68. On or about February 22, 2019, Mr. Cluchey executed and delivered a Release and Waiver of Lien (the "First Lien Waiver") to WEI with respect to the MSKCC Project, at which point WEI had paid ARP a total of $25,000.00 for the engineering fee on October 12, 2018, prior to entering into the Contract, but nothing under the Contract.  The First Lien Waiver was submitted in connection with ARP's request for payment on Invoice No. 4095 in the original amount of $268,392.50, which was not paid by WEI, but led to Invoice No. 4095R1 issued on March 14, 2019, in the amount of $172,208.74, as discussed below.  A copy of the First Lien Waiver, along with the original Invoice No. 4095 and email from Mr. Cluchey to WEI is attached as Exhibit I and is incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 68 are admitted.**

69.     In mid-March 2019, on or about March 12-15, 2019, Mr. Cluchey and Russ Kiser at WEI exchanged email communications concerning the first draw to be paid to ARP, which under the Contract was the 50% initial draw for Systems 3, 4, and 7—the first batch of Systems to be built under the Contract.

**ANSWER:  In response to Paragraph 69, the allegations are admitted.**

70.     Through the email exchanges in mid-March 2019, the revised version of the first invoice (No. 4095) issued by Mr. Cluchey to WEI, Invoice No. 4095R1 in the amount of $174,708.74, was further reduced to correspond with the schedule of draws and calculations contained in a spreadsheet emailed by Russ Kiser to Mr. Cluchey on March 13, 2019.  Copies of these emails, both versions of Invoice # 4095R1 dated March 14, 2019, issued in the revised amount of $172,208.74, and WEI's Check, No. 6423 in the same amount issued on March 15, 2019 and deposited into ARP's LMCU Checking Account on March 18, 2019 are attached as Exhibit J and are incorporated by reference herein.

**ANSWER:  In response to Paragraph 70, the allegations are admitted except to the extent that the invoices were issued by ARP and not by Mr. Cluchey.**

71.     In short, on March 18, 2019, WEI made its first payment to ARP toward the Contract (not counting the $25,000 engineering fee previously paid on the separate Engineering Purchase Order) in the amount of $172,208.74.

**ANSWER:  The allegations contained in Paragraph 71 are admitted.**

72.     At the time of the first payment on March 18, 2019, ARP had a mere $8,037.25 in its LMCU Checking Account, and only $948.54 in its Comerica Bank checking account (which was subsequently closed on or about April 17, 2019).

**ANSWER:  The allegations contained in Paragraph 72 are admitted, upon information and belief.**

73.    In July 2019, Mr. Cluchey repeatedly wrote to WEI with pleas to advance more money on Systems 3, 4, and 7, even though the Systems were not complete or delivered – under the Contract, delivery at Sloan-Kettering was the trigger for further payment (the 40%).  Copies of certain of these emails are attached as Exhibit K and are incorporated by reference herein.

**ANSWER:  In answer to Paragraph 73 it is admitted that Mr. Cluchey, on behalf of ARP, advised Plaintiff that costs were much higher than ARP had estimated for the first batch of the System.**

74.    Mr. Cluchey's pleas began on July 17, 2019, when he wrote to WEI as follows:

> We are advancing on ARP3/4 and ARP 7.  We are about 90% on ARP3/4 and 80% on ARP7.  These first two systems are turning out to be more expensive than I had estimated.  **We have used up the advance and would like to get the balance as soon as possible.** We have all equipment on site and the majority of it is installed on the skids.  I am completing the wiring of ARP3/4 this week and we anticipate testing soon.  The control panel and distribution panel for ARP7 is shipping to us this week so we can get going on that system.
>
> I know that the contract says we get the balance on shipping, **but we really need it sooner so we can pay some bills.**  Please consider my request as soon as possible and let me know y our [sic] decision."

*See* Emails sent: Wednesday, July 17, 2019 12:40 PM and 12:43 PM, Subject: Progress on Project and FW: Progress on Project, Exhibit L (emphasis added).

**ANSWER:  In response to Paragraph 74 the documents referenced speak for themselves.**

75.    In a subsequent email on July 23, 2019, Mr. Cluchey wrote:

> As you can see we are in the process of completing the wiring for ARP 3-4.  Should be complete by Thursday afternoon this week.  ARP 7 is waiting for control panel and power distribution panel.  **All other equipment is on site waiting to be mounted after control panel is mounted.**

\*      \*      \*

> Thanks for working with us on the cash flow issue. **We will be good for the remaining units**. If you don't want ARP-3/4 and ARP-7 shipped then we will crate them and store them until you are ready.

*See* Email sent: Tuesday, July 23, 2019 8:18 AM, Subject: FW: Progress Photos for ARP3-4 and ARP 7, attached as part of Exhibit K (ARP00552) and incorporated by reference herein. In other words, Mr. Cluchey represented to WEI as of July 23, 2019, that he *only* needed additional funds to complete Units 3, 4, and 7, and that "we will be good" with the budget for all the future Units ARP promised to manufacture.

**ANSWER: In response to Paragraph 75 the emails speak for themselves.**

76.     Based upon the email sent on July 23, 2019, pictures that Mr. Cluchey sent the same day, and after he followed up with emails on July 24 and 26, 2019, asking for a decision on his request, WEI sent Mr. Cluchey a calculation of the amount of the draw advance based upon WEI's perception of the state of completion of the Systems—90% for ARP 3/4 and 60% for ARP7—which was multiplied by the shipping draw amounts for each, resulting in advances of $55,175.88 for ARP 3/4 and $45,876.28 for ARP 7. *See* Email sent: Friday, July 26, 2019 11:09 AM, Subject: FW: Progress Photos for ARP3-4 and ARP 7, attached as Exhibit M and incorporated by reference herein.

**ANSWER: The allegations contained in Paragraph 76 are admitted.**

77.     Based upon Mr. Cluchey's representations and the calculation set forth in the July 26, 2019 email (Exhibit M), WEI made its second payment to ARP, this time by wire transfer, in the total amount of $101,052.16 which was deposited into ARP's LMCU Checking Account on July 29, 2019. This second payment represented the majority (71.67%) of the 40% draw for Systems 3, 4, and 7 (Batch 1).

**ANSWER: The allegations contained in Paragraph 77 are admitted.**

78.     With the benefit of ARP's account statements for the LMCU Checking Account and its QuickBooks records, obtained through discovery in the District Court Action, it is now readily apparent that the reason for Mr. Cluchey's repeated requests for a draw advance in July 2019 was that ARP was running out of money—not just running out of the money advanced by WEI for this Project, but running out of money altogether.

**ANSWER:  In response to Paragraph 78, it is admitted that ARP was running low on funds at that time.**

79.     As of July 26, 2019, ARP had only $16,562.83 in its LMCU Checking Account, according to its July 2019 Statement of Accounts for account number xxxxxx5188.

**ANSWER:  The allegations contained in Paragraph 79 are admitted upon information and belief.**

80.     Not only was ARP running out of money in July 2019, but it is readily apparent that ARP had not paid its suppliers for the parts purchased to build the Systems, as exemplified by ARP's immediate payment of $55,603.09 to Danfoss on July 29, 2019 (the same day as the $101,052.16 from WEI was deposited), followed by a payment of $28,968.17 by ARP to AmEx on July 30, 2019.

**ANSWER:  It is admitted that ARP used the payment made to it to pay creditors of the company.**

81.     As of mid to late July 2019, ARP fell behind and no longer had sufficient money to purchase all of the parts required to build the Systems, and fell behind in its ability to build the Systems, a situation that persisted for the remainder of the Project, but which Mr. Cluchey concealed from WEI for the next 11 months.

**ANSWER:  The allegations contained in Paragraph 81 are denied for the reason they are untrue.**

82.     On October 15, 2019, Mr. Cluchey sent two invoices to WEI—the first (Invoice No. 4098 in the amount of $38,714.83) for "the balance of the ARP3/4 and 7 builds, and the second (Invoice No. 4099 in the amount of $200,155.29) "for the build of ARP-10, 5, 9 7 6 [sic] which are on the schedule for October 2019.  We have completed the initial design and are ready to start ordering parts and components."  *See* Email sent: Tuesday, October 15, 2019 11:49 AM, Subject: Invoice For Completed Work and New Work, Exhibit N.

**ANSWER:  In response to Paragraph 82 it admitted that ARP sent the referenced invoices and that the facts set forth therein were true.**

83.     In his email dated October 15, 2019, Mr. Cluchey wrote that "Both systems [ARP3/4 and 7] are **100% complete and waiting final testing by your team.**"  *See* Email sent: Tuesday, October 15, 2019 11:49 AM, Subject: Invoice For Completed Work and New Work, Exhibit N (emphasis added).

**ANSWER:  The allegations contained in Paragraph 83 are admitted.**

84.     On or about October 11, 2019, ARP's LMCU Checking Account had a balance of only $2,967.58, and it was only due to ARP's receipt of a payment of $53,380.00 from or concerning a project with Mechanical Systems West Inc. that ARP had money to pay suppliers, utilities, expenses, until ARP received the next payment from WEI on November 21, 2019.

**ANSWER:  In response to the allegations set forth in Paragraph 84, it is admitted that ARP used the payment made by Mechanical Systems West to pay ARP creditors.**

85.     On or about November 1, 2019, Mr. Cluchey executed and delivered a Partial Release and Waiver of Lien (the "Second Lien Waiver") to WEI with respect to the MSKCC

Project, at which point WEI had paid ARP a total of $273,260.90 on account of Invoices No. 4095R1 and 4096, not including the $25,000.00 engineering fee paid on October 12, 2018 prior to entering into the Contract. The Second Lien Waiver was submitted in connection with ARP's request for payment of $36,714.83, as discussed below. A copy of the Second Lien Waiver is attached as Exhibit O and is incorporated by reference herein.

**ANSWER: The allegations contained in Paragraph 85 are admitted.**

86.    Also on or about November 1, 2019, Mr. Cluchey executed and delivered a Partial Release and Waiver of Lien (the "Third Lien Waiver") to WEI with respect to the MSKCC Project, at which point WEI had paid ARP a total of $273,260.90 on account of Invoices No. 4095R1 and 4096, not including the $25,000.00 engineering fee paid on October 12, 2018 prior to entering into the Contract. The Third Lien Waiver was submitted in connection with ARP's request for payment of $200,155.29, as discussed below. A copy of the Third Lien Waiver, along with the later version signed on November 21, 2019 is attached as Exhibit P and is incorporated by reference herein.

**ANSWER: The allegations contained in Paragraph 86 are admitted.**

87.    On November 6, 2019, in relation to Mr. Cluchey's request that ARP be paid $200,155.29 on Invoice No. 4099 dated October 15, 2019 (the initial 50% draw for Systems 5, 6, 9, and 10 (Batch 2)), Mr. Cluchey wrote by email to WEI concerning Systems 3/4 and 7 that "[w]e **have completed the units** in conformance to the PO and expect to be paid." A copy of this email is attached as Exhibit Q and is incorporated by reference herein.

**ANSWER: The allegations contained in Paragraph 87 are admitted.**

88.    On or about November 7, 2019, ARP had approximately $9,718.43 in its LMCU Checking Account, and immediately before the next WEI Payment was made to ARP on November 21, 2019, ARP had $7,812.75 in its LMCU Checking Account.

**ANSWER:  The allegations contained in Paragraph 88 are admitted, upon information and belief.**

89.    On November 15, 2019, Mr. Cluchey once again wrote to WEI that "**[w]e have completed all work items for ARP3-4 unit** and are ready to resume testing."  He also wrote that "we have reserved time and space [for the next four systems] and are planning on ordering material and equipment as soon as WEI releases the build funds. . . .  It is imperative that the funds are made available [for the next four systems] so we can proceed" and he threatened that if WEI did not proceed, he would consider WEI in breach of the Contact.  *See* Email sent: Friday, November 15, 2019 5:29 PM, Subject: RE: MSK Project Testing and Build Schedule, attached as Exhibit S[3] and incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 89 are admitted.**

90.    On or November 21, 2019, Mr. Cluchey executed another version of the Third Lien Waiver and WEI proceeded to pay ARP $200,155.29 by wire transfer.  *See* Third Lien Waiver, Exhibit P.  According to its bank account statement, ARP had only $7,812.75 in its LMCU Checking Account at the time this WEI Payment was made to ARP.

**ANSWER:  The allegations contained in Paragraph 90 are admitted.**

91.    In fact, ARP was *not* "planning on ordering material and equipment as soon as WEI releases the build funds" for the next four systems (Batch 2), being Systems 5, 6, 9, and 10.  Rather, ARP used approximately $100,000 of the money (earmarked for Systems 5, 6, 9, and 10) to pay for unpaid supplies purportedly associated with Systems 3, 4, and 7 (contrary to the Lien Waivers Mr. Cluchey signed).  And Mr. Cluchey later testified at his deposition taken in the District Court Action that he, through ARP, spent only approximately ten thousand dollars ($10,000) *total* on

---

[3]    Exhibit R has been intentionally omitted.

Units 5, 6, 9, and 10, and that this money was spent to order frames (skids) for the Units—critically, WEI possesses no evidence beyond Mr. Cluchey's word that he even spent that $10,000.00 on Units 5, 6, 9, and 10, because Mr. Cluchey never provided any such frames (skids) to WEI. Mr. Cluchey, through ARP, then spent the remaining $90,000.00 on something other than the WEI project.

**ANSWER: The allegations contained in Paragraph 91 are denied for the reason they do not accurately reflect the facts as stated.**

92. Mr. Cluchey has freely admitted that he did not "tell [WEI] at that point in time that the money [WEI] was paying for 5, 6, 9, and 10 was not going to be applied towards 5, 6, 9, and 10." He acknowledge that he could have informed WEI of this fact on November 6, or 15 (or any day), but he admitted that he decided not to tell WEI.

**ANSWER: The factual allegations contained in Paragraph 92 are admitted. By way of further response, it is improper for Plaintiff to characterize a statement as "freely admitted" – this is a pleading, not a novel.**

93. As described above, in August, September, and October 2019, leading up to Mr. Cluchey' representation to WEI that Units ARP 3/4 were complete and to his execution of the Second and Third Lien Waivers, both in November 2019, he was drawing amounts from the Second HELOC in order to keep ARP afloat—some draws were deposited to ARP; other draws were used for as of yet unknown purposes.

**ANSWER: The allegations contained in Paragraph 93 are admitted.**

94. Critically, at no point during this period did Mr. Cluchey inform WEI that ARP was largely, if not almost entirely, dependent on payments from WEI for income, or that Mr. Cluchey was taking draws on the Second HELOC in order to fund ARP.

**ANSWER:  In response to Paragraph 94, Mr. Cluchey on behalf of ARP several times advised Plaintiff that ARP was incurring costs greater than its estimated costs.**

95.     On March 4, 2020, Mr. Cluchey wrote to ARP that "**ARP-3/4 and 7 are complete, ARP 5,6,9,&10 [sic] are in production**.  ARP 8 shows delivery in July, 2020.  This unit should probably be put on order by WEI soon for us to make that date."  *See* Email sent: Wednesday, March 4, 2020 8:36 AM, Subject: RE: New Schedule, attached as Exhibit T and incorporated by reference herein.

**ANSWER:  In response to Paragraph 95, the document speaks for itself.**

96.     On March 5, 2020, WEI's minutes of a meeting with Mr. Cluchey reflect Mr. Cluchey's representations that "**[e]quipment is on order for ARP 5, 6, 9, 10**" and that Mr. Cluchey planned on "ordering equipment April 1[,] 2020" presumably for ARP (System 8).  *See* Notes from Meeting Date: 3/5/2020 8:30 AM, attached to email sent: Wednesday, March 4, 2020 8:36 AM, Subject: RE: New Schedule, attached as Exhibit U and incorporated by reference herein.

**ANSWER:  In response to Paragraph 96, Mr. Cluchey admits the minutes speak for themselves.  Mr. Cluchey denies that the minutes are correct if they say what is stated.**

97.     On or about March 13, 2020, Mr. Cluchey counter-signed, on behalf of ARP as the Subcontractor, a Change Order to Subcontract Agreement (the "Change Order"), which increased the Contract Price by $3,125.00 in conjunction with Change Order 18126-013015-030620-ARP, but which also identified and confirmed the payments made by WEI to ARP, up to that point, under the Contract, which totaled $473,416.19 (as detailed therein).  *See* Change Order, along with the email by which it was sent to WEI, attached as Exhibit V and incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 97 are admitted.**

98.    Importantly, in the Change Order that Mr. Cluchey signed on March 13, 2020, it states that ARP, as "Subcontractor represents[]and warrants to the best of its knowledge that there are no existing facts or circumstances as of the date of this change order that would give rise to an additional change order for an increase of the contract price or an extension of time under the Subcontract." *See* Change Order, Exhibit V.

**ANSWER:  In response to Paragraph 98, the Change Order speaks for itself.**

99.    On March 19, 2020, Mr. Cluchey sent to WEI by email Invoice No. 4100 in conjunction with the Change Order, writing that "[t]his work is complete." The Invoice is attached as Exhibit W and is incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 99 are admitted, except that the invoice was from ARP, not Mr. Cluchey.**

100.    On April 1, 2020, Mr. Cluchey sent an email to WEI indicating that Batch 1 of the Systems (ARP 3/4 and 7) had been crated, as requested, and sent a link to pictures of the Units before and after crating. As a result, Mr. Cluchey requested that WEI release "the balance of the shipping portion due for ARP-3-4 and 7." *See* Email sent: Wednesday, April 1, 2020 2:53 PM, Subject: ARP-7 and ARP-3/4 before and after crating, attached as Exhibit X and incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 100 are admitted.**

101.    On April 14, 2020, Mr. Cluchey again wrote to WEI by email "concerning the balance of payment due ARP for the completion of the crating of the two systems as specified in your purchase order to us. We have completed the task and would like the balance due ARP paid." *See* Email sent: Tuesday, April 14, 2020 9:56 AM, Subject: ARP-3/4 & 7 Crating, attached as Exhibit Y and incorporated by reference herein.

34

**ANSWER:  The allegations contained in Paragraph 101 are admitted.**

102.    On April 16, 2020, Mr. Cluchey sent Invoice, No. 4101, dated the same date for ARP-8, in the amount of $59,605.94.  *See* Email sent: Thursday, April 16, 2020 8:53 AM, Subject: ARP-8 Build Portion and Invoice No. 4101 dated 4/16/20, attached as Exhibit Z and incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 102 are admitted.**

103.    On or about April 20, 2020, WEI wrote to Mr. Cluchey to send him another lien form, advising him that they could not "pay your Invoice No. 4098 R2 until they got a revised 'Partial Release and Waiver of Lien'.  We have Paid to Date $476,541.19 instead of the $273,260.90 that is listed on the original Lien form (since so much time has passed since you initially sent the Lien form)."

**ANSWER:  The allegations contained in Paragraph 103 are admitted.**

104.    Mr. Cluchey executed and delivered a notarized Partial Release and Waiver of Lien (the "<u>Fourth Lien Waiver</u>") to WEI with respect to the MSKCC Project, dated April 20, 2020, at which point WEI had paid ARP a total of $476,541.19 on account of Invoices No. 4095R1, 4096, 4099, and 4100 (Change Order), not including the $25,000.00 engineering fee paid on October 12, 2018 prior to entering into the Contract.  The Fourth Lien Waiver was submitted in connection with ARP's request for payment of $59,605.95, as discussed below.  A copy of the Email sent: Monday, April 20, 2020 8:41 AM, Subject: ALERT – Revised Partial Release and Waiver of Lien, along with a copy of the Fourth Lien Waiver are attached as Exhibit AA and are incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 104 are admitted.**

105.    In the First, Second, Third, and Fourth Lien Waivers (collectively, the "Lien Waivers"), which Mr. Cluchey signed as President of ARP, he warrantied to WEI, among other things, that "(ii) all material suppliers from whom we or our Subcontractors have purchased materials used in this Project, have been paid for materials delivered; (iii) no such material supplier has any claim or demand or right of lien against the property and improvements of WEI or [MSKCC / Owner] arising out of the Project; and (iv) other than as may have been timely noticed to WEI or [MSKCC / Owner], **we have not been delayed in the performance of its work to date and has incurred no extra costs in connection therewith**. . . ." *See* Exhibits I, O, P, and AA (emphasis added).

**ANSWER:  In response to Paragraph 105, the Lien Waivers speak for themselves.**

106.    Relying on Mr. Cluchey's representations that Units 3, 4, and 7 had been 100% complete for many months, on April 28, 2020 WEI paid ARP the remaining $36,714.83 of the 40% draw on those Units.

**ANSWER:  In response to Paragraph 106, it is admitted that the payment was made.  Mr. Cluchey is without knowledge as to what representations Plaintiff was relying on when it made the payments and therefore lacks sufficient information to answer the remaining allegations set forth in Paragraph 106.**

107.    Relying on Mr. Cluchey's representations for many months that Units 5, 6, 9, and 10 were "in production" and that ARP was ready to buy parts for Unit 8, on April 28, 2020 WEI paid $59,605.94 as the 50% advance on Unit 8.

**ANSWER:  In response to Paragraph 107, it is admitted that the payment was made.  Mr. Cluchey is without knowledge as to what representations Plaintiff was relying on when it**

4867-8751-1598.1

made the payments and therefore lacks sufficient information to answer the remaining allegations set forth in Paragraph 107.

108.    In truth, Mr. Cluchey had been deceiving WEI for many, many months.  He had only spent approximately $10,000.00 on Units 5, 6, 9, and 10 (and even that expenditure may be false, given that Mr. Cluchey never provided the frames that the $10,000.00 was supposedly spent on), despite receiving $200,155.29 from WEI for those Units.  He had not even ordered parts for Unit 8, despite receiving the advance payment to do so.  Instead, Mr. Cluchey had no intention of buying parts for Unit 8, but instead, intended to use the WEI money for other purposes—business and personal.

**ANSWER:  The allegations contained in Paragraph 108 are denied.**

109.    On May 13, 2020, Mr. Cluchey sent an email to the officers of WEI regarding the MSK[CC] Hospital Project (the "Repudiation Notice") to inform them that "this hasn't worked out as planned[,]" "[t]his is not a sustainable situation for ARP" and advising WEI that there were two options: (1) for ARP to file bankruptcy or (2) "to renegotiate a new price schedule for the project with WEI."  A true and accurate copy of the Repudiation Notice is attached as Exhibit BB and is incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 109 are admitted.**

110.    Notably, Mr. Cluchey's Repudiation Notice begins with the statement, "I have hesitated in writing this letter **for some time**."  *See* Repudiation Notice, Exhibit BB.  Mr. Cluchey obviously was aware of this situation "for some time," yet he had failed to disclose the situation to WEI until May 13, 2020.  In fact, Mr. Cluchey conceded at his deposition taken in the District Court Action that he knew he had grossly underestimated the WEI project by mid-2019, without

any plan to get it back on track.  Yet he deliberately concealed that fact from WEI for nearly a year.

**ANSWER:  In response to Paragraph 110 Exhibit BB speaks for itself.  To the extent an allegation is made that Mr. Cluchey deliberately concealed any fact from WEI, the same is denied for the reason that it is untrue.**

111.    The Repudiation Notice goes on to say that "[w]e would need a 50% increase in the unit prices for all of the units to bring us to break event point" and "[t]his increase would not give us any profit, but would cover our equipment, material and assembly costs."  *See* Repudiation Notice, Exhibit BB.

**ANSWER:  The allegations contained in Paragraph 111 are admitted.**

112.    Based on the original total contract price of $1,043,695.00, as set forth in Purchase Order No. 18126-013052-020119 dated February 1, 2019 (*see* Exhibit H), not including the subsequent Change Order, a 50% increase in the unit prices, as demanded in the Repudiation Notice, would have increased the total price (cost) by $521,847.50.

**ANSWER:  The allegations contained in Paragraph 112 are admitted.**

113.    At no point prior to sending WEI the Repudiation Notice by email on May 13, 2020 did Mr. Cluchey disclose the facts that: (1) he had never ordered the water treatment components for Units 3, 4, and 7 (components that would cost more than $60,000.00), (2) ARP had not bought *any* parts for Units 5, 6, 9, or 10; or (3) that ARP had no intention to, and in fact did not, order any parts for Unit 8.

**ANSWER:    Allegation #1 contained in Paragraph 113 is admitted.    The remaining allegations of Paragraph 113 are denied for the reason that they are untrue.**

114.    As detailed above, Mr. Cluchey made numerous misrepresentations to Plaintiff, WEI concerning the state of completion of the Systems, as well as the components or parts already purchased for, or that he intended to purchase for, building the Systems.

**ANSWER:  The allegations contained in Paragraph 114 are denied for the reason they are untrue.**

115.    Mr. Cluchey's misrepresentations to WEI included, for example, that Units 3, 4, and 7 were "100% complete" by end of Summer 2019; that ARP would begin buying parts for Units 5, 6, 9, and 10 upon payment of the initial 50% payment for same; and that Units 5, 6, 9, and 10 were "in production" in early 2020; and that ARP was ready to purchase parts for Unit 8 on March 5, 2020.

**ANSWER:  The allegations contained in Paragraph 115 are denied for the reason they are untrue.**

116.    Indeed, Mr. Cluchey's lies to WEI began even *before* the Contract was signed in February 2019—in December 2018 he told ARP that he had already ordered materials for the WEI project (which was not true) simply to "pressure" (Mr. Cluchey's words) WEI into entering into the Contract with ARP in the first instance.

**ANSWER:  The allegations contained in Paragraph 116 are denied for the reason they are untrue.**

117.    During the period from on or about October 12, 2018 to April 28, 2020, Plaintiff, WEI paid ARP seven (7) payments totaling $597,861.97 (the "WEI Payments") on account of the Purchase Order for engineering services (No. 18126-FOG-091818), the Contract, and the Invoices issued by ARP to WEI, which are shown in the chart (the "Transactions Chart") attached as Exhibit CC, which is incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 117 are admitted.**

118.    The purpose for which WEI intended and understood that it was making each of the WEI Payments to ARP, based upon communications with and representations made by Mr. Cluchey, are also set forth in the Transactions Chart.  *See* Exhibit CC.

**ANSWER:  In response to the allegations contained in Paragraph 118, Mr. Cluchey lacks knowledge or information to form a belief since he does not know what Plaintiff intended or understood and therefore no response is given.**

119.    Furthermore, the date of and purpose for each of the lien waivers that Mr. Cluchey signed on behalf of ARP and delivered to Plaintiff, WEI, in order to obtain the next WEI Payment under and in connection with the Contract is set forth in the Transactions Chart in chronological sequence to the WEI Payments.  *See* Exhibit CC.

**ANSWER:  In response to Paragraph 119, the Transactions Chart speaks for itself and is the work product of the Plaintiff.  Defendant neither admits nor denies the factual allegations set forth in the Chart.**

120.    Notwithstanding his repudiation of the Contract through the Repudiation Notice, and that when he repudiated the Contract the funds in ARP's LMCU Checking Account largely, consisted of funds paid to it by WEI for performance of the Contract—the last two payments of $200,155.29 on November 21, 2019 and $96,320.78 on April 28, 2020, Mr. Cluchey did not return any of the funds to WEI; instead, he decided to pay off his personal line of credit—the Second HELOC (as defined above) secured by the Second HELOC Mortgage (as defined and discussed below) on his residence (7095 Mindew, as defined below)—and paid off ARP's credit card debt that included his personal expenses.

**ANSWER:  The allegations contained in Paragraph 120 are denied in part and admitted in part.  The payments themselves are admitted.  The loan made by Mr. Cluchey to the company is admitted and it is admitted that it was paid.  The allegation that the ARP credit card includes personal expenses is denied for the reason it is untrue.**

121.    A review of ARP's QuickBooks records of payments from all customers indicates that from March 2019 up until the end of July 2020, out of total customer payments of $693,448.73 received by ARP, $572,861.97 were paid by WEI (not including the $25,000 engineering fee paid in October 2018).

**ANSWER:  In response to Paragraph 121, the QuickBooks records speak for themselves.**

122.    In short, Mr. Cluchey, through ARP, induced WEI to continue making Contract payments to ARP, when ARP, in fact, was not performing the Contract and was using WEI's money for other, including but not limited to, personal purposes.

**ANSWER:  The allegations contained in Paragraph 122 are denied for the reason they are untrue.**

### D.    Comerica Bank Home Equity Lines of Credit (HELOCs)

123.    On or about September 30, 2014, Mr. and Mrs. Cluchey entered into an Equity Line Account Agreement and Disclosure Statement for a home equity line of credit (the "First HELOC") with Comerica Bank, account number xxxxxxx1596.[4]

**ANSWER:  The allegations contained in Paragraph 123 are admitted.**

124.    To secure the repayment of the First HELOC in the initial sum of $29,200.00, Mr. and Mrs. Cluchey granted a Home Equity Mortgage (Line) ("First HELOC Mortgage") to Comerica Bank on their current residence, which is a condominium commonly known as 7095

---

[4]    Only the last four digits of this financial-account number is included in accordance with Fed. R. Bankr. P. 9037(a).

Mindew Drive SW (Unit 21), Byron Center, Michigan 49315 ("7095 Mindew")[5], Parcel Number 41-21-10-281-021, which First HELOC Mortgage was recorded with the Kent County, Michigan Register of Deeds Office on October 7, 2014 as Document Number 201410070083306.

**ANSWER:  The allegations contained in Paragraph 124 are admitted.**

125.    At the time granted, the First HELOC Mortgage was junior to a Senior Lien (as defined in the First HELOC Mortgage), being a Mortgage that Mr. and Mrs. Cluchey granted on or about July 25, 2014 in favor of Macatawa Bank on 7095 Mindew (the "First Mortgage"), which was recorded with the Kent County, Michigan Register of Deeds Office on August 4, 2014 as Document Number 20140804-0061959, to secure the repayment of a promissory note dated July 25, 2014 in the principal amount of $50,000.00.

**ANSWER:  The allegations contained in Paragraph 125 are admitted.**

126.    The First Mortgage was released as fully paid, satisfied, and discharged, through a Discharge of Mortgages dated and recorded with the Kent County, Michigan Register of Deeds Office on July 17, 2018 as Document Number 201807170054740.

**ANSWER:  The allegations contained in Paragraph 126 are admitted.**

127.    On or about August 12, 2019, Mr. and Mrs. Cluchey took out a second home equity line of credit (the "Second HELOC") with Comerica Bank, account number xxxxxxx1128, in the amount of $75,200.00, by executing a Credit Agreement and Disclosure Statement—Home Equity Line of Credit.

**ANSWER:  The allegations contained in Paragraph 127 are admitted.**

---

[5]    This real property is identified as Mr. Cluchey's residence in his Voluntary Petition, in Part 1.1 of Mr. Cluchey's Schedule A/B, and as secured by a HELOC Mortgage recorded 8/15/2019 in Part 2.2 of his Schedule D.  *See* Voluntary Petition, Schedules and Statement of Financial Affairs (Dkt. 1), filed March 2, 2021.

128.     To secure the repayment of the Second HELOC, Mr. and Mrs. Cluchey granted a Home Equity Mortgage (Line) ("Second HELOC Mortgage") to Comerica Bank on their current residence, 7095 Mindew, Parcel Number 41-21-10-281-021, which Second HELOC Mortgage was recorded with the Kent County, Michigan Register of Deeds Office on August 15, 2019, as Document Number 201908150060734.

**ANSWER:  The allegations contained in Paragraph 128 are admitted.**

129.     As reflected in the Account Line of Credit Statements for the First HELOC and Second HELOC, the First HELOC was paid off, on or about August 16, 2019, with an advance drawn on the Second HELOC in the amount of $18,042.74, which then became the balance due on the Second HELOC as reflected in the Account Line of Credit Statement dated August 17, 2019.

**ANSWER:  The allegations contained in Paragraph 129 are admitted.**

130.     The First HELOC Mortgage was then cancelled and discharged as paid in full through a Discharge of Mortgages dated and recorded with the Kent County, Michigan Register of Deeds Office on September 6, 2019 as Document Number 201909060067483.

**ANSWER:  The allegations contained in Paragraph 130 are admitted.**

131.     Since taking the Second HELOC on their residence, Mr. Cluchey caused **ARP** to pay each of the monthly total minimum payments due on the Second HELOC, which are set forth in the Account Line of Credit Statements dated August 17, 2019 through April 17, 2020, for the benefit of himself and Mrs. Cluchey, from ARP's LMCU Checking Account, as follows:

| Check No. | Check Date | Min. Amount Paid |
|---|---|---|
| 1741 | 9/4/2019 | $100.00 |
| 1753 | 10/7/2019 | $142.24 |
| 1774 | 10/29/2019 | $183.16 |
| 1797 | 12/2/2019 | $195.22 |
| 1833 | 1/8/2020 | $188.93 |
| 1848 | 1/28/2020 | $194.93 |
| 1881 | 3/9/2020 | $194.69 |
| 1901 | 4/1/2020 | $295.12 |
| 1920 | 5/6/2020 | $315.47 |
|  |  | $1,809.76 |

**ANSWER:  The allegations contained in Paragraph 131 are admitted.**

132.    On May 15, 2020, Mr. Cluchey caused ARP to issue on ARP's LMCU Checking Account a check, number 1933, in the amount of $71,807.67, payable to Comerica Bank (the "Second HELOC Payoff"), for the purpose of paying off the entire balance due and owing on the line of credit secured by the Second HELOC Mortgage on his and Mrs. Cluchey's residence, being 7095 Mindew.  A copy of the check that Mr. Cluchey wrote for the Second HELOC Payoff is attached as Exhibit DD, which is incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 132 are admitted.**

133.    When asked, at his continued deposition taken in the District Court Action on December 29, 2020, why he paid off the Second HELOC from ARP's LMCU Checking Account, Mr. Cluchey said "there was a lien on my house and I wanted to get rid of it."  Cont. 30(b)(6) Dep.

44

of Larry Cluchey, Dec. 29, 2020 at 309, ll. 5-6, *Worthington Energy Innovations, LLC v. Am. Research Prods., Inc.*, Case No. 3:20-cv-01454 (N.D. Ohio March 30, 2021), ECF No. 22-2.

**ANSWER: The allegations contained in Paragraph 133 are admitted.**

134.    Mr. Cluchey wrote the check for the Second HELOC Payoff just two days after he sent the Repudiation Notice to WEI, as further described above, in which he advised WEI that ARP could not perform its obligations to WEI and threatened WEI that it would have to pay another (at least) $500,000 in order for ARP complete the contract or ARP would file bankruptcy.

**ANSWER: The allegations contained in Paragraph 134 are admitted. Mr. Cluchey objects to the characterization of the term "threatened" when Mr. Cluchey indicated ARP would have to cease to operate without additional funds to complete the outstanding Purchase Orders.**

135.    At the time Mr. Cluchey issued the check for the Second HELOC Payoff, on or about May 15, 2020, ARP had approximately $116,013.90 in its sole checking account—the LMCU Checking Account.  Of this total account balance, $96,320.78 was from the last payment that WEI made to ARP, which was deposited on or about April 28, 2020, on account of the last two invoices paid by WEI in the amounts of $36,714.83 (ARP Invoice # 4098R) and $59,605.95 (ARP Invoice # 4101).

**ANSWER: The allegations contained in Paragraph 135 are admitted, upon information and belief.**

136.    The Second HELOC Payoff cleared the LMCU Checking Account on May 18, 2020, thereby paying off (actually, overpaying) the full balance due and owing on the line of credit obligation of Mr. and Mrs. Cluchey, as reflected in the Account Line of Credit Statement dated May 17, 2020.

**ANSWER:  The allegations contained in Paragraph 136 are admitted.  In further Answer, the overpayment was an error by Comerica in the calculation of the payoff.**

137.    On or about October 23, 2020, Comerica Bank sent Mr. and Mrs. Cluchey a letter concerning the Second HELOC account enclosing a check (No. 130893) payable to Mr. and Mrs. Cluchey in the amount of $615.47 to refund the overpayment (credit) on their account, which, upon information and belief, they kept.

**ANSWER:  The allegations contained in Paragraph 137 are admitted with the exception that the over payment caused by Comerica was deposited in ARP's checking account at LMCU.**

138.    As Mr. Cluchey testified at his Section 341 meeting of creditors held on March 31, 2020, at the time he filed his Voluntary Petition in this case Comerica Bank had not yet released the Second HELOC Mortgage.  Accordingly, the Second HELOC Mortgage was listed in his Schedule D with a claim amount of $0.00.

**ANSWER:  The allegations contained in Paragraph 138 are admitted.**

139.    As Mr. Cluchey also testified at his Section 341 meeting of creditors held on March 31, 2020, he paid off the Second HELOC Mortgage with his company's funds—funds of ARP— in May 2020, and subsequent to filing his Voluntary Petition Comerica Bank released the Second HELOC Mortgage.

**ANSWER:  The allegations contained in Paragraph 139 are admitted.**

140.    The Second HELOC Mortgage was then cancelled and discharged as paid in full through a Discharge of Mortgages dated and recorded with the Kent County, Michigan Register of Deeds Office on September 6, 2019 as Document Number 201909060067483.

**ANSWER:  The allegations contained in Paragraph 140 are admitted, upon information and belief.**

141.    This was not the first time that Mr. Cluchey had used ARP's money to pay off a personal line of credit.  On or about January 15, 2014, Mr. Cluchey issued a check (No. 2934) in the amount of $37,826.23, drawn on ARP's Comerica Checking account, payable to Comerica for "repayment for personal LOC."

**ANSWER:  The allegations contained in Paragraph 141 are admitted.**

  **E.**  **2019 Honda Ridgeline.**

142.    In or about December 2018, Mr. Cluchey purchased a 2019 Honda Ridgeline Black Edition pickup truck, VIN # 5FPYK3F84KB016726 (the "Honda Ridgeline") for approximately $43,000, which purchase was financed with a loan from Members First Credit Union ("MFCU"), account number xxxx6300.

**ANSWER:  The allegations contained in Paragraph 142 are admitted.**

143.    Mr. Cluchey, as both Lessor (in his individual capacity) and as Lessee (on behalf of ARP), wrote and signed a Vehicle Lease Agreement dated December 20, 2018 (the "Honda Ridgeline Lease") for ARP to lease the Honda Ridgeline from him for 36 months at a base fee of $968.87 per Month.

**ANSWER:  The allegations contained in Paragraph 143 are admitted.**

144.    The monthly base fee under the Honda Ridgeline Lease was, upon information and belief, the same amount as the monthly payment due from Mr. Cluchey to MFCU on the loan he obtained to purchase the Honda Ridgeline.

**ANSWER:  The allegations contained in Paragraph 144 are admitted.**

145.    Mr. Cluchey subsequently caused ARP to make all of the monthly payments due on the loan from MFCU, in the amount of $968.87 each, directly to MFCU from ARP's LMCU Checking Account.  As shown in the Vendor QuickReport attached as Exhibit EE and incorporated by reference herein, during the period from January 10, 2019 through August 10, 2020, Mr.

Cluchey caused ARP to pay MFCU, directly from ARP's LMCU Checking Account, a total of $9,688.70.

**ANSWER: The allegations contained in Paragraph 145 are admitted.**

146. In addition making all of the monthly loan payments for the Honda Ridgeline, Mr. Cluchey caused ARP to pay for all of the insurance, maintenance (oil changes, etc.) and fuel, either directly from the LMCU Checking Account or through charging the amounts on ARP's credit card account—the American Express Business Gold Rewards account, ending number x-x1009 and the paying the balance due on that credit card account from the LMCU Checking Account.

**ANSWER: The allegations contained in Paragraph 146 are admitted.**

147. As listed in his Statement of Financial Affairs, Mr. Cluchey sold the Honda Ridgeline on August 18, 2020 for the approximate amount of $29,500. *See* SOFA, Item 18 (Dkt. No. 1).

**ANSWER: The allegations contained in Paragraph 147 are admitted.**

148. After paying off the loan from MFCU taken to purchase the Honda Ridgeline, the net amount of $14,367.23 was paid to Mr. Cluchey, not to ARP. *See* SOFA, Item 18 (Dkt. No. 1).

**ANSWER: The allegations contained in Paragraph 148 are admitted.**

149. On February 25, 2021, Mr. Cluchey paid a litigation retainer in the amount of $14,000.00 to Wardrop & Wardrop, P.C., Debtor's counsel in Mr. Cluchey's chapter 7 bankruptcy, which was in addition to the attorney fees and costs that Mr. Cluchey paid Wardrop & Wardrop, P.C. to file his chapter 7 bankruptcy, in the amount of $4,375.00, also paid on February 25, 2021. *See* SOFA, Item 16 (Dkt. No. 1).

**ANSWER: The allegations contained in Paragraph 149 are admitted.**

150.    Mr. Cluchey testified at his Section 341 meeting of creditors held on March 31, 2021 (presently adjourned), that the retainer of $14,000.00 paid to Wardrop & Wardrop, P.C. was from the net proceeds of the sale of the Honda Ridgeline that he received on August 18, 2020.

**ANSWER:  The allegations contained in Paragraph 150 are admitted.**

F.    **Action in U.S. District Court in Toledo.**

151.    On July 1, 2020, WEI, as Plaintiff, filed a Complaint against ARP and Mr. Cluchey in the United States District Court for the Northern District of Ohio, Western Division (the "District Court"), Case No. 3:20-cv-01454 (the "District Court Action").

**ANSWER:  The allegations contained in Paragraph 151 are admitted.**

152.    In the District Court Action, WEI sought to recover its direct, indirect, and consequential damages incurred as a result of Defendants ARP and Mr. Cluchey's fraud, and WEI also asked the Court to pierce ARP's corporate veil under an alter ego theory and hold Mr. Cluchey personally liable.

**ANSWER:  In response to Paragraph 152, the Complaint speaks for itself.**

153.    In the District Court Action, Mr. Cluchey and ARP responded to written discovery requests and produced records.  WEI took the combined depositions under oath of Mr. Cluchey (individually) and ARP (Mr. Cluchey was designated as the 30(b)(6) company representative) on December 7, 2020 and, as continued, on December 29, 2020.

**ANSWER:  The allegations contained in Paragraph 153 are admitted.**

154.    Solely with respect to ARP, which has not filed bankruptcy, on March 17, 2021, WEI filed a Motion for Summary Judgment Against Defendant American Research Products, Inc., seeking judgment on Counts I (Breach of Contract) and IV (Fraud) of the Complaint.  *See* Mot. for Summ. J., *Worthington Energy Innovations, LLC v. Am. Research Prods., Inc.*, Case No. 3:20-cv-01454-JZ (N.D. Ohio March 17, 2021), ECF No. 21.

**ANSWER:  The allegations contained in Paragraph 154 are admitted.**

155.    On April 19, 2021, Plaintiff was granted judgment on Counts I and IV against ARP. *Worthington Energy Innovations, LLC v. Am. Research Prods., Inc.*, Case No. 3:20-cv-01454-JZ (N.D. Ohio April 19, 2021), ECF No. 24.

**ANSWER:  The allegations contained in Paragraph 155 are admitted.**

156.    On April 22, 2021, a Final Judgment Against Defendant ARP, Inc. (the "Final ARP Judgment") was entered in the District Court Action against ARP in the amount of One Million, Nine Hundred Thirty-Eight Thousand, One Hundred Fifty Dollars and Twenty-Seven Cents ($1,938,150.27), this amount being based upon (as cited to in the Final ARP Judgment) the Declaration of Russ Kiser, the General Manager for Plaintiff, WEI.  *Worthington Energy Innovations, LLC v. Am. Research Prods., Inc.*, Case No. 3:20-cv-01454-JZ (N.D. Ohio April 22, 2021), ECF No. 25.  A copy of the Final ARP Judgment is attached as Exhibit FF and is incorporated by reference herein.

**ANSWER:  The allegations contained in Paragraph 156 are admitted.**

157.    Also on April 22, 2021, the District Court entered an Order Staying and Closing Case by which the District Court Action, as against Mr. Cluchey, was stayed and it was ordered that "Plaintiff may seek to reopen this case against [Mr. Cluchey] consistent with any rulings from the bankruptcy action."  *Worthington Energy Innovations, LLC v. Am. Research Prods., Inc.*, Case No. 3:20-cv-01454-JZ (N.D. Ohio April 22, 2021), ECF No. 26.

**ANSWER:  The allegations contained in Paragraph 157 are admitted.**

158.    As of the filing of this Complaint, as a result of ARP's and Mr. Cluchey's repudiation of and failure to perform the Contract with WEI, and fraud committed against WEI, WEI has suffered actual and consequential damages of at least $1,938,150.27.  WEI continues to

incur damages as it continues to work to cure Mr. Cluchey's, and therefore ARP's, breaches and bad acts.

**ANSWER:  The allegations contained in Paragraph 158 are denied for the reason they are untrue.**

159.    Due to the fraud committed by Mr. Cluchey and because ARP is his alter ego such that the corporate veil should be pierced, Mr. Cluchey should be held personally liable for the actual and consequential damages cause by ARP's repudiation and failure to perform the Contract with WEI.

**ANSWER:  Paragraph 159 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

160.    In addition to actual and consequential damages, the Contract entitles WEI to recover its attorney's fees from ARP incurred to enforce the terms of the Contract, and therefore from Mr. Cluchey due to the fraud he committed and because ARP is his alter ego.

**ANSWER:  Paragraph 160 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

161.    WEI is also entitled to pre- and post-judgment interest at the maximum rate allowed by law and/or provided for under the Contract, on all sums awarded against Mr. Cluchey.

**ANSWER:  Paragraph 161 sets forth a conclusion of law for which no Answer is required. To the allegations of fact are made, the same are denied.**

### G.    Mr. Cluchey's Chapter 7 Case and Adjourned 341 Meeting of Creditors

162.    WEI is, substantively, Mr. Cluchey's sole unsecured creditor.

**ANSWER:  The allegations contained in Paragraph 162 are admitted.**

163.    According to Mr. Cluchey's Schedule D, he has only one secured creditor, Bank of America, which holds a lien on the only vehicle that he and his non-filing spouse own—a 2018

Honda CR-V, in which he and his non-filing spouse have approximately $6,059.99 of equity (on total value of $17,500.00) as of the date Mr. Cluchey filed his chapter 7 petition.

**ANSWER:  The allegations set forth in Paragraph 163 are admitted.**

164.    As set forth in Mr. Cluchey's Schedule E/F, of the total nonpriority unsecured debt listed, which is $1,701,102.57, almost all of this is owed to Worthington Energy, which is listed with a contingent, unliquidated, and disputed claim of $1,695,723.94.  (*See* Schedule E/F, Item 4.9 (Dkt. 1, March 2, 2021)).  As noted above, WEI's actual judgment against ARP is higher— $1,938,150.27.

**ANSWER:  With respect to the allegations contained in Paragraph 164, no debt is currently due and owing to Plaintiff by Mr. Cluchey.**

165.    Almost all of the nonpriority unsecured debt that Mr. Cluchey scheduled, other than the debt owed to Worthington Energy, is a $5,124.00 contingent claim on a co-signed lease of a vehicle that his sister "has possession" of and "insures, maintain[s] payments." (*See* Schedule E/F, Item 4.5 (Dkt. 1, March 2, 2021); Schedule G, Item 2.1 (Dkt. 1) (stating Mr. Cluchey is "[c]o-signor only for 2018 48 month Vehicle Lease – sister maintains possession, insures, makes payments @ $427.15/month."); Schedule H, Item 3.2 (listing Connie Hoffman, Mr. Cluchey's sister, as the co-debtor on the vehicle lease listed on Schedule E/F, line 4.5).  It is a 48-month lease, which began in 2018.

**ANSWER:  The allegations contained in Paragraph 165 are admitted.  In further Answer, the vehicle has been turned in and the lease was cancelled in May of 2021.**

166.    The reason Worthington Energy is Mr. Cluchey's sole unsecured creditor is that he used the money he fraudulently obtained from Worthington Energy to pay off much of his personal debts, including but not limited to the home equity line of credit (Second HELOC) that had been

secured by a mortgage on his residence (*see* Schedule D, Item 2.2 (Dkt. No. 1, March 2, 2021)) (listing Comerica Bank as a secured creditor with a claim of $0.00 on account of a HELOC Mortgage recorded 08/15/2019), as well as debt incurred on the American Express ("AmEx") Business Gold Rewards credit card, account ending x-x1009 (the "ARP AmEx"), that Mr. Cluchey used on a day-to-day basis to pay both his business and personal expenses, including but not limited to meals, food, fuel, travel (lodging and air fare), and other purchases.

**ANSWER:  The allegations contained in Paragraph 166 are denied for the reason that they are untrue.**

167.    Mr. Cluchey routinely paid all of the charges incurred on the ARP AmEx, which included many of his personal expenses, with funds of his solely owned and operated company, ARP, and also paid certain charges on his personal AmEx Gold Delta SkyMiles credit card, account ending x-x1001 (the "Cluchey AmEx"), with ARP funds.

**ANSWER:  The allegations contained in Paragraph 167 are denied for the reason they are untrue.  In further Answer, ARP's AmEx charges were business related.**

168.    At Mr. Cluchey's meeting of creditors held on March 31, 2021, Mr. Cluchey testified under oath as follows:

    a.    That nobody else is involved with ARP; it is just him;

    b.    Although Mr. Rueckert owns 50% of the shares of ARP, Mr. Rueckert is a "silent partner" who lives and works in Wisconsin;

    c.    The original intention, when ARP was formed in 2005, was that Mr. Rueckert would take on a larger role with ARP, but that just never happened;

    d.    He admitted that he used money from ARP to pay his personal debts.

e.    He admitted that WEI had paid him close to $600,000 before the contract was terminated in May 2020;

f.    That he has no mortgage on his residence, which is 7095 Mindew;

g.    That sometime in June, maybe, of 2020 he paid off the Comerica Bank HELOC mortgage (the Second HELOC) listed in Schedule D (Item 2.2), with ARP's money;

h.    That subsequent to filing his chapter 7 petition Comerica Bank had released its HELOC mortgage, as further discussed in Section IV.D., above;

i.    That the Comerica Bank HELOC mortgage listed in Schedule D (Item 2.2) was a second mortgage, a lien on their home (7095 Mindew) (although there is no first mortgage), that "we" used the money to fund the company, ARP, and "then we just paid it off with company funds";

j.    "We" had taken money out on that mortgage to help fund the operation of the corporation, ARP, and the corporation, ARP, paid that money back;

k.    Mr. Cluchey is claiming an entireties exemption on 7095 Mindew;

l.    Mr. Cluchey claims to be an "inventor" who designs and builds "humidification systems for adding moisture to air in commercial and industrial facilities";

m.    When he, Mr. Cluchey, uses the term "we" in reference to his status as an inventor and his company, ARP, there is actually nobody else, he is using the royal "we";

n.    He, Mr. Cluchey, does not have any specific inventions or patents, or any contracts for the use of his inventions;

o.     He, Mr. Cluchey, has "nothing, I guess" with respect to his inventions, he just used them in his business;

p.     Dale Rueckert is the other, 50% owner of ARP, he is in Wisconsin, and he is a "silent" partner;

q.     Mr. Rueckert "does nothing, really" for the business (ARP), he had a sales firm and he represented ARP in Wisconsin for sales in Wisconsin, and he just was an original partner / 50% owner, but "he was never active in the business";

r.     Originally, the only Mr. Rueckert provided for the business (ARP) was the $2,000.00 he paid for his initial shares of stock, although he put some money in over the years;

s.     ARP stopped operating, "probably in June of 2020" and nothing has been happening since, although he has sold a "miniscule" amount of replacement parts, and nothing now;

t.     There are no assets remaining of ARP—apart from equipment that he had built for WEI, which was picked up in June 2020, there was office equipment that was auctioned off;

u.     That "we", referring to him as ARP, had a contract with WEI for supplying equipment to a hospital in New York City; "we" got into the contract and "realized that we had grossly underestimated what it was going to take to do the project";

v.    That "we", referring to him as ARP, went to WEI and told them that "without additional funds we could not continue the contract" and when WEI did not provide additional funds "we" stopped work on the project;

w.    When asked by the Trustee what corporate documents he has concerning ARP, Mr. Cluchey stated that he has "all financial records from when the corporation was formed, up through last year" and "we" have the incorporation papers "and that's about the extent of it";

x.    Any money that came to him, from ARP, came as payroll;

y.    All the money of ARP was spent as of January of 2021;

z.    "We," referring to him and Mrs. Cluchey, put money into ARP out of the Comerica line of credit against their home, which ARP subsequently paid off;

aa.    He has no non-consumer (business) debt, other than the debt to WEI;

bb.    ARP has not filed bankruptcy;

cc.    WEI paid ARP close to $600,000;

dd.    Nobody else sued ARP or him prior to his bankruptcy filing;

ee.    The debt he owes on the 2018 Honda CR-V is his only secured debt;

ff.    He personally owned the Honda Ridgeline truck, but ARP made the monthly payments as ARP leased it from him;

gg.    After he sold the Honda Ridgeline truck in August 2020, he received the balance of the sale proceeds, personally;

hh.    Although there was nothing official, he retired in July or August of 2020; that's when he decided it was over, after ARP shut down;

4867-8751-1598.1

ii.    With respect to the Systems he was building for WEI, he represented that "there were two Systems that were completed and were all crated";

jj.    The $14,000.00 retainer that Mr. Cluchey paid to Wardrop & Wardrop, P.C. came from the proceeds of sale of the Honda Ridgeline; and

kk.    The Honda Ridgeline sold for $29,500.00 and he netted $14,367.00.

**ANSWER:  In response to the numerous allegations set forth in Paragraph 168, many of which are duplications of the allegations set forth in Paragraph 35 of the Complaint, Mr. Cluchey avers as follows:**

**a.**    **The allegations contained in Paragraph 168 a are admitted.**

**b.**    **The allegations contained in Paragraph 168 b are admitted.**

**c.**    **The allegations contained in Paragraph 168 c are admitted.**

**d.**    **The allegations contained in Paragraph 168 d are admitted.  In further Answer, what Mr. Cluchey meant was that ARP paid him on loans he made to ARP.**

**e.**    **The allegations contained in Paragraph 168 e are admitted.**

**f.**    **The allegations contained in Paragraph 168 f are admitted.**

**g.**    **The allegations contained in Paragraph 168 g are denied for the reason it is untrue.  In further Answer, ARP repaid Mr. Cluchey the funds he had loaned ARP and Mr. Cluchey then paid off the loan.**

**h.**    **The allegations contained in Paragraph 168 h are admitted.**

**i.**    **In response to Paragraph 168 i, the funds were used to finance the operations of ARP.  In further Answer, the payment to Comerica came from the repayment by ARP of the loan made to ARP by Mr. Cluchey.**

57

j.      The allegations contained in Paragraph 168 j are admitted.  In further Answer, the payment to Comerica came from the repayment by ARP of the loan made to ARP by Mr. Cluchey.

k.      The allegations contained in Paragraph 168 k are admitted.

l.      In response to Paragraph 168 l, the word inventor was not one used by Mr. Cluchey.  It was a word used by Plaintiff's attorney during the deposition.  It is admitted that ARP designed and built the systems.

m.      The allegations contained in Paragraph 168 m are admitted.

n.      The allegations contained in Paragraph 168 n are admitted.

o.      In response to Paragraph 168 o Defendant states that during normal business operations machines and expertise were developed by ARP that allowed it to be successful in its business operations.

p.      The allegations contained in Paragraph 168 p are admitted.

q.      The allegations contained in Paragraph 168 q are admitted.

r.      The allegations contained in Paragraph 168 r are admitted.

s.      The allegations contained in Paragraph 168 s are admitted.

t.      The allegations contained in Paragraph 168 t are admitted.

u.      The allegations contained in Paragraph 168 u are admitted.

v.      The allegations contained in Paragraph 168 v are admitted.

w.      The allegations contained in Paragraph 168 w are admitted.

x.      The allegations contained in Paragraph 168 x are denied for the reason that they are untrue.

y.     The allegations contained in Paragraph 168 y are denied because they are untrue.

z.     The allegations contained in Paragraph 168 z are denied because they are untrue.  In further Answer, Mr. and Mrs. Cluchey borrowed the funds from the bank, and the funds were loaned to ARP.

aa.    The allegations contained in Paragraph 168 aa are admitted.

bb.    The allegations contained in Paragraph 168 bb are admitted.

cc.    The allegations contained in Paragraph 168 cc are admitted.

dd.    The allegations contained in Paragraph 168 dd are admitted.

ee.    The allegations contained in Paragraph 168 ee are admitted.

ff.    The allegations contained in Paragraph 168 ff are admitted.

gg.    The allegations contained in Paragraph 168 gg are admitted.

hh.    The allegations contained in Paragraph 168 hh are admitted.

ii.    The allegations contained in Paragraph 168 ii are admitted.

jj.    The allegations contained in Paragraph 168 jj are admitted.

kk.    The allegations contained in Paragraph 168 kk are admitted.

169.    Notwithstanding that Mr. Cluchey was working as the President of ARP in 2018, 2019, and 2020, on his Form 1040 – U.S. Individual Income Tax Returns for each of those tax years he listed his occupation as "RETIRED."

**ANSWER:  The allegations contained in Paragraph 169 are admitted.**

170.    Notwithstanding that Mr. Cluchey owned and operated ARP in 2018, 2019, and 2020, the only year for which he reported receiving any income from ARP was tax year 2019, for which he reported receiving $11,931.00 in wages from ARP.

**ANSWER:  The allegations contained in Paragraph 170 are admitted.**

171.    On April 27, 2021, the Chapter 7 Trustee, Marcia R. Meoli, filed a Joint Claims Notice (Dkt. No. 23) in Mr. Cluchey's chapter 7 case, which set a deadline for creditors to file "joint claims" relating to the payment of claims "from the liquidation of real estate owned jointly by the Debtor and the Debtor's spouse (entireties property)."  *See* Joint Claims Notice, *In re Cluchey*, Case No., 21-00524-jwb (Bankr. W.D. Mich. Apr. 27, 2021), ECF No. 23.  Further, the Joint Claims Notice explained that Mr. Cluchey's chapter 7 case shall be administered "according to applicable law, including **In re Trickett**, 14 B.R. 85 (Bkrtcy. W.D.Mich. 1981) as it is presently applied."  *See id.*

**ANSWER:  Paragraph 171 sets forth a conclusion of law for which no response is required. To the extent allegations of fact are made, the same are admitted.**

###### H.    <u>Fraudulent, Voidable and Preferential Transfers</u>.

172.    After ARP, by and through Mr. Cluchey, repudiated the Contract with WEI, he caused ARP to transfer funds to: (a) payoff of the Second HELOC, for his and his wife's (Mrs. Cluchey's) benefit, in the amount of $71,807.67, and (b) pay monthly loan payments due to MFCU, in the amount of $968.87 each (for a total of $9,688.70 as set forth in Exhibit EE), plus the net sale proceeds of the Honda Ridgeline in the amount of $14,367.23, for his benefit, which total up to $86,174.90.  These transfers (transactions) are subject to avoidance and recovery from Mr. Cluchey and, as to the payments on the Second HELOC and as to certain of the AmEx Transfers, from Mr. Cluchey and Mrs. Cluchey, pursuant to the claims asserted below.

**ANSWER:  In response to Paragraph 172, it is admitted that the transfers alleged were made but the characterization of the payments is denied.  The remaining allegations are denied for the reason they are untrue.**

173.    Furthermore, the related loan payments made from ARP's funds on both: (a) the Second HELOC, in the amount of $1,809.76 as set forth in paragraph 131 above, (b) the loan taken for the purchase of the Honda Ridgeline in the amount of $9,688.70 as set forth in paragraph 145 above, and (c) certain of the AmEx Transfers, in an amount to be determined, are subject to avoidance and recovery from Mr. Cluchey and, as to the Second HELOC and certain of the AmEx Transfers, from Mr. Cluchey and Mrs. Cluchey, pursuant to the claims asserted below.

**ANSWER:  Paragraph 173 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

174.    Further, in addition to the money judgment that WEI seeks against Mr. Cluchey in his individual capacity for the damages, attorney's fees, and pre- and post-judgment interest due and owning as a result of fraud and piercing the corporate veil of ARP as his alter ego on the Contract with WEI, for which WEI seeks a determination that such debt is non-dischargeable through the claims asserted below, WEI seeks a determination that the debt for the fraudulent, voidable and preferential transfers (transactions) alleged herein (as well as such transfers as WEI may identify through the course of discovery) are non-dischargeable through the claims asserted below.

**ANSWER:  With respect to Paragraph 174, Mr. Cluchey does not know the reasons for or the basis for Plaintiff's action and, therefore, he lacks sufficient information or knowledge to admit or deny these allegations.**

### I.    Mr. Cluchey's Personal Liability.

175.    Mr. Cluchey abused the corporate form of ARP for his own personal benefit and to such an extent that ARP's corporate structure should be disregarded.

**ANSWER:  Paragraph 175 sets forth a conclusion of law for which no response is required. To the extent allegations of fact are made, the same are denied because they are untrue.**

61

176.    Mr. Cluchey and ARP did not observe any corporate formalities.  For example, he cannot recall holding any annual shareholder meetings for ARP, other than perhaps a trade show that he and his co-owner attended in 2005, which is "probably fair" to characterize as a "get-together that was not formally referred to as an annual meeting of shareholders."  *See* 30(b)(6) Dep. of Larry Cluchey, Dec. 7, 2020 at 37-39, *Worthington Energy Innovations, LLC v. Am. Research Prods., Inc.*, Case No. 3:20-cv-01454 (N.D. Ohio March 30, 2021), ECF No. 22-1.

**ANSWER:  The first sentence of Paragraph 176 states a conclusion of law for which no Answer is required.  It is admitted that ARP did not hold annual meetings in a formal sense. In further Answer, Mr. Cluchey and Mr. Rueckert held phone conversations on a regular basis to discuss business of the ARP.**

177.    Mr. Cluchey does not recall anyone filling the role of director for ARP and "can't agree" with the proposition that "you and Mr. Rueckert were the directors of the corporation from the start," despite being listed as such on the corporate records.  *See* 30(b)(6) Dep. of Larry Cluchey, Dec. 7, 2020 at 46.  And there were no official board of directors meetings, annual or otherwise.  *See* 30(b)(6) Dep. of Larry Cluchey, Dec. 7, 2020 at 40.

**ANSWER:  In response to Paragraph 177 the deposition testimony speaks for itself.  It is admitted that there were no official board of directors meetings, annual or otherwise.  Mr. Cluchey and Mr. Rueckert met or talked frequently regarding business activities and sale activities.  The meetings of the corporation were informal.**

178.    Mr. Cluchey thinks of ARP and himself interchangeably.

**ANSWER:  The allegations contained in Paragraph 178 are denied for the reason they are untrue.  Mr. Cluchey recognized that ARP was a corporate entity and he managed it as such. He followed corporate formalities with respect to accounting.**

179.    Mr. Cluchey considered his residence to be ARP company headquarters.  ARP's corporate headquarters is registered with the Michigan Secretary of State as Cluchey's residential address.  ARP's records are stored in Cluchey's home.  Until ARP moved to a larger facility in approximately 2019, "we did all of our business part of the work here in my home."  The address given for ARP on the Contract is Cluchey's residential address.

**ANSWER:  The allegations contained in Paragraph 179 are admitted.**

180.    Mr. Cluchey was solely responsible for operating ARP.  He handled all manufacturing and management decisions for ARP and, in fact, handled all of the labor in building what he built of the Systems; his co-owner was only involved in sales.  Mr. Cluchey personally made the decision to withhold monies from WEI after WEI filed the lawsuit.  Mr. Cluchey (along with his accounts administrator) was the only person with check writing authority on ARP's bank accounts; co-owner Rueckert had no such authority.

**ANSWER:  In response to Paragraph 180 it is admitted that Mr. Cluchey was primarily responsible for all operations of ARP.  Mr. Cluchey admits that he was solely responsible for primary decision making.**

181.    Mr. Cluchey permitted Mr. Rueckert to divert corporate opportunities from ARP. Where Mr. Rueckert – an owner of ARP – sourced a project for ARP, he marked-up the price to the customer and kept the mark-up to himself, rather than permitting ARP to realize the full benefit of the sale.

**ANSWER:  The allegations contained in Paragraph 181 are denied for the reason they are untrue.**

182.    ARP was never properly capitalized.  ARP's start-up capitalization was a total of $4,000.00, comprised of $2,000.00 each from Rueckert and Cluchey for their initial purchases of

ARP stock.  Thereafter, all contributions "scattered over a period of time" that the *owners* made to ARP were considered *loans*, rather than capitalization.  By the time WEI paid ARP its first 50% initial draw payment for the first production batch (on March 18, 2019), ARP had only $8,037.25 in its bank account and an existing American Express credit card balance of nearly three times that ($21,252.46) and minimum payment due of $6,696.68.

**ANSWER:  Paragraph 182 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied because they are untrue.**

183.    Mr. Cluchey commingled his assets with ARP and misused corporate monies for personal use.  Mr. Cluchey used ARP's bank account to make payments to State Farm Insurance, although he has no idea what relationship State Farm Insurance has with ARP.  On January 23, 2019, Mr. Cluchey used ARP's corporate American Express account to pay for a personal vacation to Orlando, Florida.

**ANSWER:  The allegations contained in Paragraph 183 are denied for the reason they are untrue.**

184.    As a result of Mr. Cluchey's actions, ARP ceased operations in mid-2020 (as Mr. Cluchey testified at his initial 341 meeting of creditors) and presently has no assets from which WEI can seek to recover the Final ARP Judgment entered in the District Court Action.

**ANSWER:  The allegations contained in Paragraph 184 are admitted.**

185.    By fraudulently transferring ARP's assets, Mr. Cluchey rendered ARP insolvent and prevented WEI from collecting on any judgment, including the Final ARP Judgment, against ARP.

**ANSWER:  Paragraph 185 sets forth a conclusion of law for which no response is required. To the extent allegations of fact are made, the same are denied because they are untrue.**

64

186.     Because Mr. Cluchey used ARP to perpetrate and did, in fact, perpetrate an actual fraud against WEI, he should be held personally liable for the debt of ARP under theories of fraud and piercing the corporate veil of ARP because ARP is his alter ego, and as an equitable remedy for his conduct in fraudulently transferring ARP's assets.

**ANSWER:  Paragraph 186 sets forth a conclusion of law for which no answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

### J.     Mr. Cluchey's Inadequate Bankruptcy Disclosures

187.     On March 2, 2021, the Debtor filed his Schedules and Statement of Financial Affairs (Dkt. No. 1).

**ANSWER:  The allegations contained in paragraph 187 are admitted.**

188.     These filings did not disclose the Second HELOC Transfers, the AmEx Transfers, or the Honda Ridgeline Transfers.

**ANSWER:  The allegations contained in paragraph 188 are admitted.**

189.     After the filing of the Voluntary Petition, Plaintiff engaged in informal discovery efforts with the Debtor.  Following Plaintiff's efforts to trace the movement of certain funds, Plaintiff identified a certain account of interest at Lake Michigan Credit Union ending in 3854.

**ANSWER:  The allegations contained in paragraph 189 are admitted, except it is believed that Defendant identified the account at Lake Michigan Credit Union ending in 3854.**

190.     At the beginning of the case, the Debtor disclosed in his answer to question 20 of his original Statement of Financial Affairs an account ending in 4447 at Lake Michigan Credit Union, which indicated that the account had previously been titled in his name jointly with his sister and that his name was removed from the account in 2020. No other accounts were disclosed.

**ANSWER:  The allegations contained in paragraph 190 are admitted.**

4867-8751-1598.1

191.    On July 19, 2021, counsel for WEI exchanged emails with counsel for the Debtor regarding, among other things, producing account statements for the accounts jointly held by Debtor and his sister at Lake Michigan Credit Union.

**ANSWER:  The allegations contained in paragraph 191 are admitted.**

192.    On August 4, 2021, counsel for WEI again exchanged emails with counsel for the Debtor asking for account statements.

**ANSWER:  The allegations contained in paragraph 192 are admitted.**

193.    On August 16, 2021, the Debtor filed an amended Statement of Financial Affairs (Dkt. No. 48), which disclosed an additional account ending in 3584 in the answer to question 20 and provided further detail on the account ending in 4447.  The amended Statement of Financial Affairs again did not disclose the Second HELOC Transfers, the AmEx Transfers, or the Honda Ridgeline Transfers.

**ANSWER:  The allegations contained in paragraph 193 are admitted.**

194.    Following the filing of the amended Statement of Financial Affairs, Debtor's counsel finally provided statements for the two accounts.  These statements showed that over $500,000 flowed through the account ending in 3584 prior to the bankruptcy filing.  The primary source of funds in this account was another account in both the Debtor and his sister's name at Independent Bank f/k/a Guaranty Bank and Trust Company ending in 2277.

**ANSWER:   The allegations contained in paragraph 194 are admitted except for the characterization that the documents were "finally provided."  It took several weeks for Defendant to obtain the necessary account statements because the accounts were not Defendant's accounts and, therefore, the account statements were not readily available to him.  Defendant diligently worked with his sister and the Bank to obtain the account**

statements requested.  **This information, even though it was not available to Defendant and would have had to be subpoenaed from his sister, was provided very diligently and to assert otherwise is misleading.**

195.    The statements disclose multiple significant transfers out of the account at Lake Michigan Credit Union ending in 3584.  The most significant transfer out of this account was a $400,000 payment on October 9, 2018 to National Financial Services LLC a/k/a Fidelity. Based upon information provided by Mr. Cluchey's counsel, this transfer went to an investment account titled solely in the sister's name.

**ANSWER:  In response to paragraph 195, the statements speak for themselves.**

### K.    Other Currently Undiscovered Transfers.

196.    Any reference to "transfers" as used herein is intended to capture any and all transfers of ARP's assets that were made to entities or individuals, which were made under circumstances similar to those alleged herein, even though such other transfers may not yet have been discovered.

**ANSWER:  Paragraph 196 does not set forth any allegation of fact and appears to be some sort of definitional paragraph.  To the extent allegations of fact are made, the same are denied because they are untrue.**

197.    WEI has not yet been able to discover whether any funds of ARP, or funds that should have been paid to ARP, were used to pay and discharge the obligations secured by the First Mortgage on 7095 Mindew, but specifically reserves the right to, and puts all parties on notice that, WEI may amend this Complaint to include claims to avoid and recover any such payments as voidable, fraudulent and preferential under applicable law, which would increase the joint debt owed by Mr. and Mrs. Cluchey to WEI.

**ANSWER:  Paragraph 197 does not set forth any allegations of fact and therefore no response is given.  Plaintiff may amend its Complaint in accordance with the Federal Rules of Bankruptcy Procedure.  Defendant denies that any monies were improperly used from ARP to discharge the first mortgage on the 7095 Mindew property.**

198.    WEI further specifically reserves the right to, and puts all parties on notice that, WEI may amend its Complaint to include any such other transfers that Mr. Cluchey caused ARP to make, which may be identified through the course of discovery.

**ANSWER:  Paragraph 198 does not set forth any conclusions of law and therefore no response is given.**

## COUNT I
### PIERCING THE CORPORATE VEIL
#### (against Defendant, Mr. Cluchey)

199.    WEI repeats the allegations contained in the paragraphs above as if fully rewritten herein.

**ANSWER:  Mr. Cluchey incorporates by reference his Answers to Paragraph 1 through 198 above as if fully provided herein.**

200.    WEI holds the Final ARP Judgment against ARP for breach of contract and fraud. Because ARP was merely an instrumentality of Mr. Cluchey used to divert assets, avoid liability, and perpetrate fraud, the Court may disregard ARP's corporate existence and hold Mr. Cluchey personally liable for the Final ARP Judgment.

**ANSWER:  Paragraph 200 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, it is admitted only that Plaintiff holds the Final Judgment against ARP and the remaining allegations are denied because they are untrue.**

68

201.    First, the facts described herein demonstrate that the entity known as ARP was a mere instrumentality of Mr. Cluchey.  In Mr. Cluchey's own words, ARP is just him.

**ANSWER:  Paragraph 201 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

202.    For example, and without limitation to the facts alleged above and as may be discovered, Mr. Cluchey (i) has not followed corporate formalities for years, if ever; (ii) paid off personal debts with ARP funds; (iii) regularly used corporate credit cards to fund personal expenses; (iv) "leased" the Honda Ridgeline he purported to own to ARP, used that vehicle for personal purposes, and paid the loan payments for the Honda Ridgeline with ARP funds directly to the credit union, MFCU, rather than any lease payments, and used those payments to reduce his personal liability and the debt owed for the Honda Ridgeline; (v) was in sole control of ARP's finances and decision-making (Mr. Rueckert, the other 50% shareholder, never had any active role in the management of ARP and served solely as a sales representative for ARP in Wisconsin), and (vi) testified under oath that ARP was just him.  In sum, ARP was a mere instrumentality of Mr. Cluchey, which he used to funnel assets to himself personally to avoid liability to creditors, including WEI.

**ANSWER:  In response to Paragraph 202, Defendant denies allegations (ii), (iii) and (iv) because they are untrue.  Defendant further states that the remaining statements of fact can be more fully explained in the context of corporate operations and thus are denied because they are untrue.**

203.    Second, Mr. Cluchey used this alter ego to commit a fraud or wrong.  Mr. Cluchey made multiple misrepresentations to WEI to induce WEI to pay money to ARP.  Then, instead of using the money to do the work he represented ARP would perform, Mr. Cluchey took that money

69

and used it for the benefit of himself and his wife, leaving ARP with inadequate funds to finish the work or to repay its creditors, including WEI. And, in addition to misappropriating funds, Mr. Cluchey, both personally and through his alter ego ARP, committed fraud upon WEI as detailed herein and as reflected by entry of the Final ARP Judgment in the District Court Action.

**ANSWER: The allegations contained in Paragraph 203 are denied for the reason they are untrue. In further Answer, the losses sustained by the Plaintiff were the result of ARP misbidding the contract and the devastating effect of the COVID Pandemic upon ARP's business and not the personal actions of Mr. Cluchey. With respect to the Final Judgment entered in District Court, it was entered only because neither Mr. Cluchey nor ARP had funds to contest the Judgment.**

204.    WEI has suffered an unjust loss by virtue of Mr. Cluchey's improper use of ARP. As established by the Final ARP Judgment, ARP, which breached its contract with WEI and committed fraud, currently owes WEI no less than $1,938,150.27. And because Mr. Cluchey used ARP as a front to shield himself from liability while at the same time diverting ARP's assets to his personal benefit, ARP is unable to pay WEI the amounts it owes.

**ANSWER: The allegations contained in Paragraph 204 are denied for the reason they are untrue.**

205.    Finally, additional facts support a finding that ARP is a mere alter ego of Mr. Cluchey, including, without limitation, that: (a) ARP was never adequately capitalized—the two shareholders having each purchased all the issued common shares for $2,000 each and never providing further capital; (b) ARP was undercapitalized at the time Mr. Cluchey fraudulently induced WEI to do business with ARP and through the entire course of the parties' dealings with each other; (c) Mr. Cluchey often used his residential address as the address and physical location

for ARP; (d) apart from the bank account that Mr. Cluchey routinely used to pay personal debts, ARP had no separate assets of its own from Mr. Cluchey's; and (e) Mr. Cluchey failed to report as income the money he diverted from ARP, as well as his day-to-day personal living expenses that he routinely paid from ARP's funds.

**ANSWER: Paragraph 205 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, it is denied that the company was undercapitalized or that there was any basis for any alter ego liability by Mr. Cluchey. It is denied that ARP paid any personal debts of Mr. Cluchey because these allegations are untrue.**

206.    As a result, the Court should pierce the corporate veil and hold Mr. Cluchey personally liable for the damages WEI incurred as a result of ARP's, and therefore his, breach of contract and fraud, as set forth in the Final ARP Judgment against ARP—actual and consequential damages of at least $1,938,150.27—, plus damages that WEI continues to incur as it continues to work to cure Mr. Cluchey's, and therefore ARP's, breaches and bad acts (and works to complete the Project), plus attorney's fees to which WEI is entitled under the Contract, plus exemplary damages, including but not limited to reasonable attorney's fees, plus pre- and post-judgment interest at the maximum rate allowed by law and/or provided for under the Contract, on all sums awarded against Mr. Cluchey.

**ANSWER: Paragraph 206 sets forth a conclusion of law for which no Answer is required. Further, the relief sought is not properly sought in an Adversary Proceeding. The proper form for bringing a monetary claim against an individual in an individual bankruptcy is the filing of a Proof of Claim that can then be contested by the Debtor.**

71

## COUNT II
### FRAUD
### (against Defendant, Mr. Cluchey)

207.   WEI repeats the allegations contained in the paragraphs above as if fully rewritten herein.

**ANSWER:  Mr. Cluchey incorporates by reference his Answers to Paragraphs 1 through 206 above as if fully set forth herein.**

208.   From September 2018 to May of 2020, Mr. Cluchey made several material misrepresentations of fact to WEI, with knowledge of their falsity and an intent to defraud.

**ANSWER:  The allegations contained in Paragraph 208 are denied for the reason they are untrue.**

209.   Specifically, as examples and without limitation of the allegations set forth above that are incorporated herein, Mr. Cluchey misrepresented the following:

    a.    On December 6, 2018, Mr. Cluchey falsely told WEI that ARP had "equipment and material on order for the [S]ystems and need the money to cover our expenses."  In fact, ARP had *not* ordered any materials for WEI and would not do so until March 2019 (three months later).  Mr. Cluchey concedes he lied to WEI to "pressure" WEI into signing the Contract.

    b.    Fundamentally, regarding the Contract, Mr. Cluchey falsely represented that WEI's money paid for a given set of Units would be paid to build those Units.

    c.    In March of 2019, Mr. Cluchey requested the 50% advance payment for Units 3, 4, and 7 to purchase materials and to build those Units.  In fact, he spent much of the advance payment, in the amount of $172,208.74, on existing obligations unrelated to WEI.

    d.    In July of 2019, Mr. Cluchey represented that Systems 3, 4, and 7 were 80 to 90% complete; that all equipment was on site, and that a majority of the equipment had been installed.  On strength of that representation as to his progress, Mr. Cluchey requested an advance on the 40% payment that would otherwise not be due until Units 3, 4, and 7 were delivered to Sloan-Kettering (which never happened).  When WEI acceded to Mr. Cluchey's request, Mr. Cluchey immediately used almost all of the money to pay off a credit card bill and an outstanding invoice from a supplier.

72

e.  In October of 2019, Mr. Cluchey represented that Systems (Units) 3, 4, and 7 were complete.  Shortly thereafter, in November of 2019, Mr. Cluchey represented that he was ready to begin buying parts for Units 5, 6, 9, and 10.  In November of 2019, Mr. Cluchey executed and delivered the Second and Third Lien Waivers, which each represented that all material suppliers had been paid, that the project was running on schedule, and that no extra costs had been incurred.  Thereafter, on November 21, 2019, WEI paid $200,155.29 for purchasing parts on Units 5, 6, 9, and 10.  At most (and unconfirmed), Mr. Cluchey used only approximately $10,000.00 of that money for the purposes of building Units 5, 6, 9, and 10 – the remaining $190,000.00 was used either for non-WEI expenses or to pay off existing obligations relative to Units 3, 4, and 7 (which were unpaid because Mr. Cluchey used the money paid for Units 3, 4, and 7 on *other* non-WEI expenses).

f.  In February-March 2020, Mr. Cluchey told WEI that he and ARP "are currently working on [Systems] 5, 6, 9 & 10."  On March 4, 2020, Mr. Cluchey again represented that Systems 3, 4, and 7 were "**complete**" and that Systems 5, 6, 9, and 10 are "**in production.**"  Also on April 20, 2020, Mr. Cluchey executed and delivered the Fourth Lien Waiver, which again represented that all material suppliers had been paid, that the project was running on schedule, and that no extra costs had been incurred.  Thereafter, WEI funded the WEI Payments of $36,714.83 (for Units 3, 4, 7) and $59,605.95 (for Unit 8) (a total of $96,320.78).  None of this money went to the WEI project.  In fact, Units 3, 4, and 7 were never completed and Unit 8 was *never even begun*.

g.  At some point prior to the April 2019 Payment, and likely before earlier payments, Mr. Cluchey knew that he was unable to perform the Contract without further significant funding and would ultimately repudiate the Contract, yet failed to disclose any of this to WEI until May of 2020.

**ANSWER:  In response to the numerous allegations set forth in Paragraph 209, Mr. Cluchey**

**states as follows:**

a.  **The allegations contained Paragraph 209 a are denied for the reason they are untrue.  There were no misrepresentations.**

b.  **The allegations contained in Paragraph 209 b are denied for the reason they are untrue.  There were no misrepresentations.**

c.  **The allegations contained in Paragraph 209 c are denied for the reason they are untrue.  There were no misrepresentations.**

d.    The allegations contained in Paragraph 209 d are denied for the reason they are untrue.  There were no misrepresentations.

e.    The allegations contained in Paragraph 209 e are denied for the reason they are untrue.  There were no misrepresentations.

f.    The allegations contained in Paragraph 209 f are denied for the reason they are untrue.  There were no misrepresentations.

g.    The allegations contained in Paragraph 209 g are denied for the reason they are untrue.  Later in 2020 Mr. Cluchey realized that ARP could not complete the Purchase Orders.  At that time Mr. Cluchey advised Plaintiff of the issues and agreed to work with Plaintiff to minimize the cost to Plaintiff to finalize the contract with Sloan-Kettering.

210.    Mr. Cluchey made each representation with the intention that WEI would act upon same.  Over the course of the parties' dealings, Mr. Cluchey procured $597,861.97 from WEI, but he had no intention of using all of those monies for the materials or equipment required to perform the Contract.  Instead, he misappropriated certain of those funds to his and his wife's personal benefit, including funneling those funds into an assets that creditors might not be able to reach, their personal residence, and used certain of the funds for other business expenses unrelated to the WEI project (including combined payments on the ARP AmEx credit card account for obligations incurred on projects unrelated to WEI).

**ANSWER:  The allegations contained in Paragraph 210 are denied for the reason they are untrue.**

211.    WEI reasonably relied on Mr. Cluchey's material misrepresentations and omissions, and as a proximate result of Mr. Cluchey's misrepresentations and omissions, has been damaged in an amount to be determined at trial, but not less than $1,938,150.27, given that the damages will continue to accrue as WEI works to complete the Project.

**ANSWER:  Paragraph 211 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

212.    Mr. Cluchey's actions were intentional, willful, egregious, malicious, and/or wantonly negligent or reckless, such that an award of exemplary damages is also appropriate.

**ANSWER:  The allegations contained in Paragraph 212 are denied for the reason they are untrue.**

213.    As a result, the Court should hold Mr. Cluchey personally liable for the damages WEI incurred as a result of ARP's, and therefore his, breach of contract and fraud, as set forth in the Final ARP Judgment against ARP—actual and consequential damages of at least $1,938,150.27—, plus damages that WEI continues to incur as it continues to work to cure Mr. Cluchey's, and therefore ARP's, breaches and bad acts (and works to complete the Project), plus attorney's fees to which WEI is entitled under the Contract, plus exemplary damages, including but not limited to reasonable attorney's fees, plus pre- and post-judgment interest at the maximum rate allowed by law and/or provided for under the Contract, on all sums awarded against Mr. Cluchey.

**ANSWER:  Paragraph 213 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

**COUNT III**
**FRAUDULENT INDUCEMENT**
**(against Defendant, Mr. Cluchey)**

214.    WEI incorporates the allegations of the preceding paragraphs as if restated fully herein.

**ANSWER:  Mr. Cluchey incorporates by reference his Answers to Paragraphs 1 through 213 above as if fully set forth herein.**

215.    On December 6, 2018, Mr. Cluchey was anxious to enter into the WEI contract—undoubtedly because he understood ARP's precarious financial position.  To induce WEI to enter

75

into the Contract, Mr. Cluchey falsely told WEI that "we [ARP] have equipment and material on order for the [S]ystems and need the money to cover our expenses."  Mr. Cluchey now concedes this was a lie that he told to "pressure" WEI into entering the Contract.

**ANSWER:  The allegations contained in Paragraph 215 are denied for the reason they are untrue.**

216.    During the parties' negotiation of the Contract terms, Mr. Cluchey misrepresented that he was capable of providing expert engineering and manufacturing services that WEI required to perform the Sloan-Kettering contract.  Mr. Cluchey also misrepresented that he and ARP had numerous other customers, inflating the appearance of ARP as a viable business partner for WEI. In fact, Mr. Cluchey later conceded that, as of at least June 2020, WEI was ARP's only customer.

**ANSWER:  The allegations contained in Paragraph 216 are denied for the reason they are untrue.**

217.    Relative to performance of the Contract, Mr. Cluchey insisted on advance payments under the premise that he would use the advance payments to purchase materials and essentially pay for his own labor costs to build each batch of Units.

**ANSWER:  The allegations contained in Paragraph 217 are admitted.**

218.    Significantly, ARP treated each "batch" of Systems[6] as separate accounts receivable on ARP's electronic accounts ledger.  In effect, ARP intended, and represented to WEI that it intended, to treat each batch as a separate obligation, subject to segregated payment schedules.  Thus, Mr. Cluchey's misrepresentations about the status of preparation to begin a new batch of Systems induced WEI to enter into that independent stage of the Contract.

---

[6]    Batch 1 included Units 3, 4, 7; Batch 2 included Units 5, 6, 9, and 10; and Batch 3 was Unit 8 (each, a "Batch"). ARP did not even purport to begin work on the remaining two Systems listed in the Contract before ARP repudiated the Contract.

**ANSWER:  In response to Paragraph 218, Plaintiff was not privy to how ARP treated the payments on its books and records.  Thus, Plaintiff could not have relied on ARP's bookkeeping system in any way as a basis for a claim.  For those reasons, the allegations contained in Paragraph 218 are neither admitted nor denied and Plaintiff is left to its proofs.**

219.    However, Mr. Cluchey never intended to use WEI's advance payments to fulfill ARP's duties and obligations relative to the assigned batch of Systems.  Instead, Mr. Cluchey used the advanced payments made by WEI to fund debts and obligations that were unrelated to the assigned batch or, frequently, unrelated to the WEI project entirely.

**ANSWER:  The allegations contained in Paragraph 219 are denied for the reason they are untrue.**

220.    Mr. Cluchey made these statements knowing them to be false with the intention of inducing WEI's reliance and execution of the Contract and/or entering into each Batch phase of the Contract.

**ANSWER:  The allegations contained in Paragraph 220 are denied for the reason they are untrue.**

221.    WEI reasonably relied on the material misrepresentations made by Mr. Cluchey and executed the Contract and/or proceeded with the next Batch phase of the Contract, while Mr. Cluchey knew all along that based upon ARP's financial condition and prior use of funds he would, and would likely need to, misappropriate WEI's money for purposes unrelated to the Contract, and that he and ARP did not have a viable customer base other than WEI.

**ANSWER:  In response to Paragraph 221, Defendant denies that there were any material misrepresentations made at any time and all allegations of Paragraph 221 are denied for the reason they are untrue.**

222.    Mr. Cluchey made each representation with the intention that WEI would act upon same.

**ANSWER:  The allegations contained in Paragraph 222 are admitted.**

223.    WEI did act upon Mr. Cluchey's misrepresentations, and as a direct and proximate result of Mr. Cluchey's fraudulent inducement, WEI has been damaged in an amount to be determined at trial, but not less than $1,938,150.27.

**ANSWER:  The allegations contained in Paragraph 223 are denied for the reason they are untrue.  The losses occasioned to Plaintiff were due to ARP's misbidding of the Contract, the devastating impact of the COVID Pandemic, and were not due to any fraudulent actions or fraudulent intent by Mr. Cluchey individually or ARP corporately.**

224.    Mr. Cluchey's actions were intentional, willful, egregious, malicious, and/or wantonly negligent or reckless, such that an award of exemplary damages is also appropriate.

**ANSWER:  The allegations contained in Paragraph 224 are denied for the reason they are untrue.**

225.    As a result, the Court should hold Mr. Cluchey personally liable for the damages WEI incurred as a result of ARP's, and therefore his, breach of contract and fraud, as set forth in the Final ARP Judgment against ARP—actual and consequential damages of at least $1,938,150.27—, plus damages that WEI continues to incur as it continues to work to cure Mr. Cluchey's, and therefore ARP's, breaches and bad acts (and works to complete the Project), plus attorney's fees to which WEI is entitled under the Contract, plus exemplary damages, including but not limited to reasonable attorney's fees, plus pre- and post-judgment interest at the maximum rate allowed by law and/or provided for under the Contract, on all sums awarded against Mr. Cluchey.

**ANSWER:  Paragraph 225 sets forth a conclusion of law for which no Answer is required.**

**To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

<u>COUNT IV</u>
**VIOLATIONS OF THE MICHIGAN UNIFORM VOIDABLE TRANSACTIONS ACT—**
**MCL 566.34(1)(a)**
**(against Defendants, Mr. and Mrs. Cluchey)**

226.    WEI repeats the allegations contained in the paragraphs above as if fully rewritten herein.

**ANSWER:  Mr. Cluchey incorporates by reference his Answers to Paragraphs 1 through 225 above as if fully set forth herein.**

227.    As alleged above, Mr. Cluchey caused ARP to make certain transfers to or for the benefit of Mr. Cluchey and/or Mrs. Cluchey, including but not limited to:

a.      As to both Mr. and Mrs. Cluchey, an aggregate amount of $1,809.76 in minimum (i.e., interest) payments on the Second HELOC, plus the $71,807.67 payoff of the Second HELOC—a total of $73,617.43 (the "<u>Second HELOC Transfers</u>"), which reduced their respective liability on the Second HELOC and increased their equity in 7095 Mindew.

b.      As to Mr. Cluchey and/or Mrs. Cluchey, amounts to AmEx on account of the ARP AmEx credit card account and/or the Cluchey AmEx credit card account, which Mr. Cluchey used to pay personal expenses, including upon information and belief, certain of the personal, family, and household expenses of Mr. Cluchey and/or Mrs. Cluchey.  These payments were for the benefit of Mr. Cluchey and/or Mrs. Cluchey and reduced amounts they would had to have otherwise paid for such expenses (the "<u>AmEx Transfers</u>").

c.      As to Mr. Cluchey, amounts for the monthly loan payments to MFCU for on the loan secured by the Honda Ridgeline, being $9,688.70 in monthly payments relative to his personal vehicle, the Honda Ridgeline, plus regular fuel, all insurance, maintenance, and similar costs for the vehicle, which Mr. Cluchey would have otherwise had to pay for, which reduced his liability to MFCU and increase his equity in the vehicle and/or $14,367.23 of net proceeds from selling the vehicle, the Honda Ridgeline, to the extent that ARP was the true owner of the Honda Ridgeline and Mr. Cluchey held only bare legal title (the "<u>Honda Ridgeline Transfers</u>").

(Collectively, the foregoing items (a), (b), and (c) above—the Second HELOC Transfers, the AmEx Transfers, and the Honda Ridgeline Transfers—are referred to hereinafter as the "Transfers" and each a "Transfer").

**ANSWER:  The allegations contained in Paragraph 227 are denied.  All payments were made in the ordinary course of ARP's business, either as a repayment of a loan made by Mr. Cluchey to ARP or, in the case of the Honda Ridgeline, payment of a Lease between Mr. Cluchey and ARP.  It is denied that any personal expenses of Mr. Cluchey were paid by ARP because this allegation is untrue.**

228.    Each Transfer was made with the actual intent to hinder, delay, or defraud ARP's creditors, including, and mainly, WEI.  Such intent is evidenced, in part, by the following facts set forth upon information and belief:

      a.      The Transfers were to insiders of ARP;

      b.      The Transfers were not disclosed to WEI;

      c.      The Transfers included a significant amount of ARP's assets;

      d.      ARP did not receive reasonably equivalent value for the Transfers; and

      e.      ARP was insolvent at the time each Transfer was made or was rendered insolvent thereby.

**ANSWER:  Paragraph 228 sets forth a conclusion of law for which no Answer is required.  To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

229.    Each Transfer was made to or for the benefit of Mr. Cluchey and/or Mrs. Cluchey, as alleged above.

**ANSWER:  The allegations contained in Paragraph 229 are denied for the reason they are untrue.  In further Answer, the payments were made to pay obligations of ARP.**

230.    Accordingly, the Transfers are avoidable, and WEI is entitled to recover the value of, and therefore a money judgment for, the Transfers: (a) jointly and severally from Mr. and Mrs. Cluchey, as to the Second HELOC Transfers, (b) from Mr. and Mrs. Cluchey as to certain of the AmEx Transfers, and (c) from Mr. Cluchey only as to the Honda Ridgeline Transfers.  WEI is also entitled to pre- and post-judgment interest at the maximum rate allowed by law on all sums awarded against Mr. Cluchey and/or Mrs. Cluchey.

**ANSWER:  Paragraph 230 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

<u>**COUNT V**</u>
**VIOLATIONS OF THE MICHIGAN UNIFORM VOIDABLE TRANSACTIONS ACT—**
**MCL 566.34(1)(b)**
**(against Defendants, Mr. and Mrs. Cluchey)**

231.    WEI repeats the allegations contained in the paragraphs above as if fully rewritten herein.

**ANSWER:  Mr. Cluchey incorporates by reference his Answers to Paragraphs 1 through 230 above as if fully set forth herein.**

232.    Each of the Transfers was made without ARP receiving reasonably equivalent value in exchange for the Transfer.

**ANSWER:  The allegations contained in Paragraph 232 are denied for the reason they are untrue.**

233.    As a result of its undertaking the Project, ARP was engaged in a transaction for which its remaining assets were unreasonably small in relation to the transaction at hand.

**ANSWER:  The allegations contained in Paragraph 233 are denied for the reason they are untrue.**

234.    When causing ARP to undertake the Project, Mr. Cluchey intended for ARP to incur, or reasonably should have believed that ARP would incur, debts beyond its ability to pay them as they became due.

**ANSWER:  The allegations contained in Paragraph 234 are denied for the reason they are untrue.**

235.    Each Transfer was made to or for the benefit of Mr. Cluchey and/or Mrs. Cluchey, as alleged above.

**ANSWER:  The allegations contained in Paragraph 235 are denied for the reason they are untrue.**

236.    Accordingly, the Transfers are avoidable, and WEI is entitled to recover the value of, and therefore a money judgment for, the Transfers: (a) jointly and severally from Mr. and Mrs. Cluchey, as to the Second HELOC Transfers, (b) from Mr. and Mrs. Cluchey as to certain of the AmEx Transfers, and (c) from Mr. Cluchey only as to the Honda Ridgeline Transfers.  WEI is also entitled to pre- and post-judgment interest at the maximum rate allowed by law on all sums awarded against Mr. Cluchey and/or Mrs. Cluchey.

**ANSWER:  Paragraph 236 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

## COUNT VI
## VIOLATIONS OF THE MICHIGAN UNIFORM VOIDABLE TRANSACTIONS ACT— MCL 566.35(1)
### (against Defendants, Mr. and Mrs. Cluchey)

237.    WEI repeats the allegations contained in the paragraphs above as if fully rewritten herein.

**ANSWER:  Mr. Cluchey incorporates by reference his Answers to Paragraphs 1 through 236 above as if fully set forth herein.**

238.    Each of the Transfers was made without ARP receiving reasonably equivalent value in exchange for the Transfer.

**ANSWER:  The allegations contained in Paragraph 238 are denied for the reason they are untrue.**

239.    ARP was insolvent at the time of each Transfer or became insolvent thereby.

**ANSWER:  The allegations contained in Paragraph 239 are denied for the reason they are untrue.**

240.    Each Transfer was made to or for the benefit of Mr. Cluchey and/or Mrs. Cluchey, as alleged above.

**ANSWER:  The allegations contained in Paragraph 240 are denied for the reason they are untrue.**

241.    Accordingly, the Transfers are avoidable, and WEI is entitled to recover the value of, and therefore a money judgment for, the Transfers: (a) jointly and severally from Mr. and Mrs. Cluchey, as to the Second HELOC Transfers, (b) from Mr. and Mrs. Cluchey as to certain of the AmEx Transfers, and (c) from Mr. Cluchey only as to the Honda Ridgeline Transfers.  WEI is also entitled to pre- and post-judgment interest at the maximum rate allowed by law on all sums awarded against Mr. Cluchey and/or Mrs. Cluchey.

**ANSWER:  Paragraph 241 sets forth a conclusion of laws for which no Answer is required. To the extent allegations of fact are made the same are denied with respect to Mr. Cluchey.**

## COUNT VII
## VIOLATIONS OF THE MICHIGAN UNIFORM VOIDABLE TRANSACTIONS ACT— MCL 566.35(2)
### (against Defendants, Mr. and Mrs. Cluchey)

242.    WEI repeats the allegations contained in the paragraphs above as if fully rewritten herein.

**ANSWER:  Mr. Cluchey incorporates by reference his Answers to Paragraphs 1 through 241 above as if fully set forth herein.**

243.    Mr. Cluchey caused ARP to make certain of the Transfers after its debt to WEI arose and within the year prior to filing this Complaint:

a.    As to both Mr. and Mrs. Cluchey, certain of the Second HELOC Transfers;

b.    As to Mr. and Mrs. Cluchey, certain of the AmEx Transfers; and

c.    As to Mr. Cluchey, certain of the Honda Ridgeline Transfers.

(Collectively, for the purposes of this Count VII, the foregoing items (a), (b), and (c) above— certain of the Second HELOC Transfers, the AmEx Transfers, and the Honda Ridgeline Transfers—are referred to hereinafter as the "Preferences" and each a "Preference").

**ANSWER:  The allegations contained in Paragraph 243 are denied for the reason they are untrue.  In further Answer to Paragraph 243, Mr. Cluchey objects to the use of a defined term Preference.  A Preference has specific meaning under the Bankruptcy Code.**

244.    To the extent that ARP owed money to Mr. Cluchey and/or Mrs. Cluchey, the Preferences were made on account of an antecedent debt.

**ANSWER:  Paragraph 244 sets forth a conclusion of law for which no response is required. To the extent allegations of fact are made, it is admitted that ARP made payments to Mr. Cluchey on loans made by him to ARP.**

245.    Mr. Cluchey and Mrs. Cluchey were insiders of ARP at the time of each Preference.

**ANSWER:  Paragraph 245 sets forth a conclusion of law for which no Answer is required. In further Answer, the term Preference is not a defined term since this is not a claim made under the Bankruptcy Code.  As such, Mr. Cluchey cannot respond to the allegations set forth.  It is admitted that Mrs. Cluchey is an "insider" as defined in the referenced Michigan Act.**

246.    Mr. Cluchey and Mrs. Cluchey had reasonable cause to believe that ARP was insolvent.

**ANSWER:  The allegations contained in Paragraph 246 are denied for the reason they are untrue.**

247.    Each Preference was made to or for the benefit of Mr. Cluchey and/or Mrs. Cluchey.

**ANSWER:  The allegations contained in Paragraph 247 are denied for the reason they are untrue.**

248.    Accordingly, the Preferences are avoidable, and WEI is entitled to recover the value of, and therefore a money judgment for, the Preferences as alleged above, from Mr. Cluchey and Mrs. Cluchey, jointly and severally, as to certain of the Second HELOC Transfers and certain of the AmEx Transfers, and from Mr. Cluchey only as to certain of the Honda Ridgeline Transfers. WEI is also entitled to pre- and post-judgment interest at the maximum rate allowed by law on all sums awarded against Mr. Cluchey and Mrs. Cluchey.

**ANSWER:  Paragraph 248 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

4867-8751-1598.1

<u>**COUNT VIII**</u>
**NONDISCHARGEABILITY—11 U.S.C. § 523(a)(2)(A)**
**(against Defendant, Mr. Cluchey)**

249.    WEI repeats the allegations contained in the paragraphs above as if fully rewritten herein.

**ANSWER:  Mr. Cluchey incorporates by reference his Answers to Paragraphs 1 through 248 above as if fully set forth herein.**

250.    As alleged above, Mr. Cluchey owes debts to WEI on account of (a) his own fraudulent conduct; (b) the fraudulent conduct of ARP, which he should be held personally liable for under the doctrine of piercing the corporate veil and alter ego; and (c) the avoidance and recovery of the transfer of ARP's assets to him or for his benefit.

**ANSWER:  Paragraph 250 sets forth a conclusion of law for which no Answer is required. To the extent Paragraph 241 sets forth allegation of facts, the same are denied for the reason they are untrue.**

251.    The actual fraud that gives rise to Mr. Cluchey liability to WEI renders that same liability nondischargeable.

**ANSWER:  Paragraph 251 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied because they are untrue.**

252.    As described above, Mr. Cluchey made material representations to WEI or omitted material facts related to the Systems and the Contract, including but not limited to (without restating all of the foregoing which is incorporated by reference herein):

a.    The misrepresentations described above by Mr. Cluchey that he and ARP were experts in the field of adiabatic humidification systems.

b.    The misrepresentations described above regarding the status of and progress of purchasing parts for and building the different Systems, and the use of funds for materials and components related to those Systems.

4867-8751-1598.1

      c.    The misrepresentations described above in the Lien Waivers, including misstatements regarding payment of material suppliers and that there have been no delays in the performance of work and no extra costs.

**ANSWER:  The allegations contained in Paragraph 252 sets forth a conclusion of law for which no Answer is required.  To the extent allegations of fact are made, the same are denied.**

253.    Mr. Cluchey knew at the time those representations and omissions were made that they were false, or they were made with gross recklessness as to their truth.

**ANSWER:  The allegations contained in Paragraph 253 are denied for the reason they are untrue.**

254.    Mr. Cluchey intended to deceive WEI, and WEI justifiably relied on Mr. Cluchey's representations and omissions, which proximately caused WEI to suffer damages, including but not limited to the funds paid to ARP and Mr. Cluchey.

**ANSWER:  The allegations contained in Paragraph 254 are denied for the reason they are untrue.**

255.    Further, Mr. Cluchey caused ARP to make the Transfers to or for the benefit of him and/or Mrs. Cluchey with the actual intent to hinder, delay, or defraud creditors, including WEI.

**ANSWER:  The allegations contained in Paragraph 255 are denied for the reason they are untrue.**

256.    As a result, Mr. Cluchey's liability to WEI for his and ARP's fraudulent conduct, in the full amount of the debt owed by ARP to WEI on the Contract, the Final ARP Judgment in the amount of $1,938,150.27, plus further damages that WEI continues to incur as it continues to work to cure Mr. Cluchey's, and therefore ARP's, breaches and bad acts (and works to complete the Project), plus attorney's fees to which WEI is entitled under the Contract, plus exemplary damages, including but not limited to reasonable attorney's fees, plus pre- and post-judgment

interest at the maximum rate allowed by law and/or provided for under the Contract, on all sums awarded against Mr. Cluchey, as alleged in Counts I, II, and III, along with his liability to WEI for his receipt of avoidable Transfers and Preferences from ARP, as alleged in Counts IV, V, VI, and VII, are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

**ANSWER:  Paragraph 256 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

<u>COUNT IX</u>
**NONDISCHARGEABILITY—11 U.S.C. § 523(a)(6)**
**(against Defendant, Mr. Cluchey)**

257.    WEI repeats the allegations contained in the paragraphs above as if fully rewritten herein.

**ANSWER:  Mr. Cluchey incorporates by reference his Answers to Paragraphs 1 through 256 above as if fully set forth herein.**

258.    Mr. Cluchey willfully and maliciously injured WEI by virtue of his fraudulent conduct and the fraudulent transfers of ARP's assets.

**ANSWER:  The allegations contained in Paragraph 258 are denied for the reason they are untrue.**

259.    By obtaining funds from WEI through his various misrepresentations and fraud, and by diverting funds that WEI disbursed to ARP for completion of the Project to pay other debts owed by ARP, his wife, and himself, Mr. Cluchey deliberately and intentionally injured WEI.  Mr. Cluchey knew (or was substantially certain) that ARP would not have the ability to complete the Project without the funds.  His actions were specifically intended to harm WEI.

**ANSWER:  The allegations contained in Paragraph 259 are denied for the reason they are untrue.**

260.    Mr. Cluchey's conduct was malicious because he consciously disregarded his duty to complete the Project, to use the funds paid by WEI for the intended purpose of completing the Contract, and to preserve the assets of ARP for the benefit of its creditors.  Indeed, when asked why he did not refund WEI's money to WEI after repudiating the Contract, Mr. Cluchey testified under oath the "I lost all my desire to help them" once WEI filed the District Court Action.

**ANSWER:  The allegations set forth in Paragraph 260 are denied for the reason they are untrue, except Mr. Cluchey admits making the final statement.**

261.    By virtue of Mr. Cluchey's willful and malicious conduct, WEI suffered damages, including but not limited to the damages for which the Final ARP Judgment was entered in the amount of $1,938,150.27, plus further damages that may continue to accrue as WEI works to complete the Project.

**ANSWER:  The allegations contained in Paragraph 261 are denied for the reason they are untrue.**

262.    As a result, Mr. Cluchey's liability to WEI for his willful and malicious conduct, in the full amount of the debt owed by ARP to WEI on the Contract, the Final ARP Judgment in the amount of $1,938,150.27, plus further damages that WEI continues to incur as it continues to work to cure Mr. Cluchey's, and therefore ARP's, breaches and bad acts (and works to complete the Project), plus attorney's fees to which WEI is entitled under the Contract, plus exemplary damages, including but not limited to reasonable attorney's fees, plus pre- and post-judgment interest at the maximum rate allowed by law and/or provided for under the Contract, on all sums awarded against Mr. Cluchey, as alleged in Counts I, II, and III, along with his liability to WEI for his receipt of avoidable Transfers and Preferences from ARP, as alleged in Counts IV, V, VI, and VII, are nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

**ANSWER:  Paragraph 262 sets forth a conclusion of law for which no Answer is required. To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

## COUNT X
### DENIAL OF DISCHARGE—11 U.S.C. § 727(a)(4)
### (against Defendant, Mr. Cluchey)

263.    WEI repeats the allegations contained in the paragraphs above as if fully rewritten herein.

**ANSWER:  Mr. Cluchey incorporates by reference his Answers to Paragraphs 1 through 262 above as if fully set forth herein.**

264.    As stated above, Mr. Cluchey transferred substantial assets from ARP to or for the benefit of himself, including but not limited to the Second HELOC Transfers, the AmEx Transfers, and the Honda Ridgeline Transfers.

**ANSWER:  The allegations contained in Paragraph 264 are denied for the reason they are untrue.**

265.    Notwithstanding same, Mr. Cluchey disclosed on his Statement of Financial Affairs no income other than $11,931.00 in wages from ARP during 2019, and from social security, unemployment, and tax refunds for 2019 and 2020.  *See* Statement of Financial Affairs, Pages 37-38 of 59, Part 2, Questions 4 and 5 (Dkt. No. 1).

**ANSWER:  In response to Paragraph 265, Mr. Cluchey avers that the Statement of Financial Affairs was accurate when signed.**

266.    Mr. Cluchey intentionally failed to disclose his receipt of these Transfers in order to hinder, delay, or defraud his creditors and the Trustee.

**ANSWER:  The allegations contained in Paragraph 266 are denied for the reason they are**

**untrue.**

267.    As a result, Mr. Cluchey should be denied a discharge pursuant to 11 U.S.C.

§ 727(a)(4).

**ANSWER:  Paragraph 267 sets forth a conclusion of law for which no Answer is required.**

**To the extent allegations of fact are made, the same are denied for the reason they are untrue.**

**COUNT XI**
**DENIAL OF DISCHARGE—11 U.S.C. § 727(a)(4))**
**(against Defendant, Mr. Cluchey)**

268.    WEI repeats the allegations contained in the paragraphs above as if fully rewritten

herein.

**ANSWER:  Mr. Cluchey hereby incorporates by reference his Answers to Paragraphs 1**

**through 267 above as though fully set forth herein.**

269.    As stated above, in the Schedules and Statement of Financial Affairs that Mr.

Cluchey filed under oath, Mr. Cluchey failed to disclose the existence of the Lake Michigan Credit

Union account ending in 3584, which was jointly titled in his name and through which hundreds

of thousands of dollars passed prior to the filing of the petition.  Further, Mr. Cluchey only

disclosed the existence of this account following numerous inquiries from Plaintiff.

**ANSWER:  In response to the allegations contained in paragraph 269 is admitted that the**

**account was not originally disclosed.  The Defendant was unaware that he had still been on**

**the account within the applicable time period.  As soon as Defendant became aware that his**

**name was on the account within the applicable time period, the Schedules were amended to**

**disclose the existence of the account.  Mr. Cluchey never had any beneficial interest in the**

91

**account for the reason that all the funds in the account were funds deposited into the account by his sister. Mr. Cluchey made no decisions regarding how the funds were administered.**

270.    Mr. Cluchey knowingly failed to disclose the Lake Michigan Credit Union account ending in 3584 in order to hinder, delay, or defraud his creditors and the Trustee.

**ANSWER: The allegations contained in paragraph 270 are denied for the reason that they are untrue.**

271.    As a result, Mr. Cluchey should be denied a discharge pursuant to 11 U.S.C. § 727(a)(4).

**ANSWER: Paragraph 271 sets forth a conclusion of law for which no answer is required. To the extent that allegations of fact are made, the same are denied.**

**COUNT XII**
**DENIAL OF DISCHARGE—11 U.S.C. § 727(a)(2)(A))**
**(against Defendant, Mr. Cluchey)**

272.    WEI repeats the allegations contained in the paragraphs above as if fully rewritten herein.

**ANSWER: Mr. Cluchey hereby incorporates by reference his Answers to Paragraphs 1 through 271 above as though fully set forth herein.**

273.    The Second HELOC Payoff and several other Second HELOC Transfers were made within one year before the date of the filing of the Voluntary Petition.

**ANSWER: The allegations contained in paragraph 273 are admitted.**

274.    Because ARP is the alter ego of Mr. Cluchey, ARP's property is property of Mr. Cluchey, and the Second HELOC Transfers therefore constituted a transfer of property of Mr. Cluchey.

92

**ANSWER:  Paragraph 274 sets forth a conclusion of law for which no answer is required. To the extent that allegations of fact are made, the same are denied for the reason that they untrue.**

275.    Alternatively, by exercising control over ARP's property to pay his personal debts, Mr. Cluchey held an interest in the funds used to pay the Second HELOC Transfers, and the Second HELOC Transfers therefore constituted a transfer of property of Mr. Cluchey.

**ANSWER:  Paragraph 275 sets forth a conclusion of law for which no answer is required. To the extent that allegations of fact are made, the same are denied for the reason that they are untrue.**

276.    The Second HELOC Transfers were made with the intent to hinder, delay, or defraud a creditor or the Trustee.

**ANSWER:  The allegations contained in paragraph 276 are denied for the reason that they are untrue.**

277.    As a result, Mr. Cluchey should be denied a discharge pursuant to 11 U.S.C. § 727(a)(2)(A).

**ANSWER:  Paragraph 277 sets forth a conclusion of law for which no answer is required. To the extent that allegations of act are made, the same are denied for the reason that they are untrue.**

### **PRAYER FOR RELIEF**

WHEREFORE, Defendant Larry Allen Cluchey prays that the Court deny in its entirety all relief sought by Plaintiff World Energy Innovations, LLC, f/d/b/a Worthington Energy Innovations, LLC, that Defendant Larry Allen Cluchey be granted such other and additional relief as is just and equitable and that Defendant Larry Allen Cluchey be awarded his attorney fees for

having to defend those Counts that the Court finds are not properly brought as an Adversary Proceeding or over which the Court does not have jurisdiction.

WARDROP & WARDROP, P.C.,
Attorneys for Larry Allen Cluchey

Dated:  August 31, 2022

By:_____/s/ Robert F. Wardrop II_____
Robert F. Wardrop II (P31639)
Thomas M. Wardrop (P38268)
Business Address:
300 Ottawa Avenue, NW, Suite 150
Grand Rapids, MI  49503
Phone:  (616) 459-1225
Fax:  (616) 459-7273
robb@wardroplaw.com
bkfilings@wardroplaw.com

**209302.082222.AnswerAmendedComplaint.V2**

4867-8751-1598.1